Roy **HEARN,** d/b/a Martinique
Lounge et al.

v.

**H. B. SHORT,** Chief of Police, Houston
Police Department, et al.

**Civ. A. No. 70–H–1376.**

United States District Court,
S. D. Texas,
Houston Division.

April 16, 1971.

Ray Epps, Cutler & Epps, Houston,
Tex., for plaintiff Martinique Lounge.

David H. Berg and Stuart M. Nelkin,
Houston, Tex., for plaintiff-intervenor
My-O-My Club.

Crawford C. Martin, Atty. Gen. of Texas and Jay Floyd, Asst. Atty. Gen. of
Texas, Austin, Tex., for defendants Texas Dept. of Public Safety, Texas Rangers and Texas Liquor Control Board.

William A. Olson, City Atty. and
Joseph G. Rollins, Senior Asst. City
Atty., Houston, Tex., for defendant H. B.
Short.

MEMORANDUM AND ORDER

Before INGRAHAM, Circuit Judge,
and SINGLETON and BUE, District
Judges.

INGRAHAM, Circuit Judge:

Plaintiff, Roy Hearn, d/b/a Martinique Lounge, sues the defendants H. B.

Short, Chief of Police of the City of Houston; Houston Police Department; C. V. Kern, Sheriff of Harris County; Harris County Sheriff's Department; Texas Department of Public Safety; Texas Rangers and the Texas Liquor Control Board, seeking a temporary restraining order and preliminary and permanent injunctive relief enjoining the above named defendants from enforcing, and prosecuting violations of Articles 667–19B(b) and (g) [1] and 607(18) [2] of the Texas Penal Code and Article II § 36–43 of the City of Houston Municipal Code.[3] Plaintiff additionally seeks a declaratory judgment that the enumerated Articles of the Texas Penal Code and the City of Houston Municipal Code are void for vagueness and impermissible overbreadth. Plaintiff invokes the jurisdiction of this court pursuant to Title 28 U.S.C. §§ 2281 and 2284 and Title 42 U.S.C. § 1983.

The Martinique Lounge is joined in this action by the owner and operator of another lounge, the My-O-My Club, which was permitted to intervene as a party plaintiff.

Since the plaintiff prays for injunctive relief from the operation and enforcement of state criminal statutes having general application and allegedly violative of the Federal Constitution, a statutory three-judge court was convened pursuant to Title 28 U.S.C. § 2281, et seq.

A succinct summary of the pertinent facts preceding the joining of issue is as follows: On December 17 and again on December 19, 1970, the Martinique Lounge was "raided" by Houston police officers and other authorities, and certain employees therein were arrested and charged with violation of the State vagrancy statute, Note 2, *supra*, and violation of the city ordinance prohibiting "indecent dancing", note 3, *supra*. On December 22, 1970, plaintiff made application to a single judge of this district for a temporary restraining order enjoining the defendants from enforcing the provisions of the enumerated statutes, which application was granted.

On January 1, 1971, authorities "raided" the My-O-My Club and as a result thereof the manager, assistant manager and various employees were arrested and charged with violation of Article 667–19B(b) and (g) of the Texas Penal Code, Note 1, *supra*. After denial of an oral request for a temporary restraining order presented to one of the judges of this panel, the My-O-My Club sought and received, on January 4, 1971, permission from the three-judge panel to intervene in the main suit as a party plaintiff. Accordingly, the temporary restraining or-

---

1. Article 667–19B makes criminal lewd or obscene conduct at places licensed to serve liquor:

   For the purposes contemplated by this Act, conduct by any person at a place of business where the sale of beer at retail is authorized that is lewd, immoral, or offensive to public decency is hereby declared to include but not be limited to the following prohibited acts; and it shall be unlawful for any person engaged in the sale of beer at retail, or any agent, servant or employee of said person, to engage in or to permit such conduct on the premises of the Retailer:

   \* \* \* \* \*

   (b) The exposure of person or permitting any person to expose his person.

   \* \* \* \* \*

(g) Permitting entertainment, performances, shows, or acts that are lewd or vulgar.

2. Article 607 § 18 prohibits and penalizes vagrancy and prostitution:

   All persons who reside in, enter or remain in any house, place, building or other structure, or who enter or remain in any vehicle, trailer, or other conveyance for purpose of prostitution, lewdness, or assignation.

3. Sec. 36–43. Indecent dancing prohibited. No person shall dance and no licensee or operator of any dance hall shall permit or suffer any person to dance any indecent or immodest dance therein. (Code 1958, § 25–68)

der previously granted was extended and enlarged to include the My-O-My Club within its command.

A further recitation of the factual history of the litigation is unnecessary for in cases such as the one at bar—where the State's criminal legal machinery has been set in operation prior to the plaintiff's seeking of redress in Federal Court—the Supreme Court has afforded the lower Federal Courts a polestar by which to guide the exercise of their equitable powers—one which is dispositive of the issues presented herein.

On February 23, 1971, the Supreme Court handed down its decision in Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (Feb. 23, 1971) and five companion cases—the dominant theme of which was the propriety of a Federal district court intervening in pending State criminal prosecutions by way of injunctive and declaratory relief. Predicated upon the fundamental policy against Federal interference with State criminal prosecutions, the Court in Younger, supra, made it abundantly clear that failing proof of bad faith prosecution, harassment or other unusual circumstances evincing irreparable injury which is "both great and immediate", a Federal district court entertaining a challenge to a State penal statute alleged to be facially unconstitutional should, on the basis of comity and the principles of federalism, abstain from interfering in the State criminal prosecution, in esse at the time the Federal suit is filed. The corollary of course is that:

> "The accused should first set up and rely upon his defense in the state courts, even though this involves a challenge of the validity of some statute, unless it plainly appears that this course would not afford adequate protection."

Fenner v. Boykin, 271 U.S. 240, 243–244, 46 S.Ct. 492, 493, 70 L.Ed. 927 (1926), quoted in Younger, supra, 401 U.S. at 45, 91 S.Ct. at 751.

■ Having reviewed the entire record in this case, we are convinced that neither plaintiff nor intervenor have demonstrated irreparable injury as that concept is articulated in Younger, supra, and its companion cases, nor can either point to a high probability of infringement of a constitutional right which is incapable of being fully adjudicated and protected in defense of the State criminal prosecutions.

We reiterate that the State's criminal processes were set in operation as to both the plaintiff and the intervenor prior to the entry of each through the portals of the Federal courthouse. Moreover, an accused may not avoid the result mandated by the Supreme Court in circumstances such as these by pleading guilty to the State charge without raising his constitutional defense, thereby bypassing the opportunity available in the State forum—for such procedural manipulations not only violate the spirit of Younger but are unavailing. The controlling factor is whether State criminal proceedings are pending at the time Federal relief is sought, a circumstance clearly evident in the instant case.

■ As a final matter we note that the plaintiff additionally seeks injunctive relief from the operation and enforcement of a municipal ordinance, Note 3, supra. That consideration of such an ordinance local only in character and scope is without the purview of this three-judge court is clear. Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (February 23, 1971); Moody v. Flowers, 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967). As such, we make no determination as to this aspect of the case and remand that claim for relief to the single District Judge for his action and disposition.

Accordingly, it is ORDERED as follows:

(1) The temporary restraining order heretofore entered on December 22, 1970,

and thereafter extended pending resolution of the merits is hereby dissolved, vacated and set aside;

(2) The prayer for injunctive and declaratory relief sought by plaintiff and intervenor as to Articles 667–19B(b) and (g) and 607(18) of the Texas Penal Code is hereby denied and the claims for relief are dismissed at plaintiff's and intervenor's cost.

(3) The claim for relief from the operation and enforcement of Article II § 36–43 of the City of Houston Municipal Code is remanded to a single District Judge for his action and disposition.

SINGLETON, District Judge (specially concurring):

I feel reluctantly compelled to follow the recent holdings of the Supreme Court in Younger v. Harris, *supra*, and its companion cases. Those cases and the various opinions written in connection therewith have created in my mind a legal caldron with respect to the constitutional questions discussed, particularly with reference to proper injunctive and declaratory relief by a federal three-judge court. If as a federal district judge I could properly adopt the opinion of Mr. Justice Brennan with whom Mr. Justice White and Mr. Justice Marshall joined, concurring in part and dissenting in part, in Perez v. Ledesma, 401 U.S. 82, 93, 91 S.Ct. 674, 678, 27 L.Ed.2d 701 (1971), I would do so and meet the issues raised in the case before us head-on. Because there are no pending criminal charges against the My-O-My Club, declaratory relief, as pointed out by Mr. Justice Brennan, would seem historically appropriate. However, since dismissal is compelled on the bases pointed out in this court's majority opinion, no precedential value could be gained by further discussion of the substantive issues involved. However, I do have strong feelings that the first amendment, and its proscription against censorship, applies to the legal issue of obscenity (if in fact there is any such legal concept) and in this connec-

tion the standards set forth in Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967) should be implemented in cases such as the one before us. *See also* Blount v. Rizzi, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971); United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672, 680 (1968).

BUE, District Judge (concurring specially):

I fully concur in the result reached and the reasoning employed in the Court opinion in this case. However, while such dismissal can be dispositive of the bare legal issues before this Court, it scarcely comes to grips with the malady which has spread at an ever-increasing rate in recent years—the use and abuse of First Amendment protection under the Constitution as a vehicle for the commercial distribution of obscenity in its various forms. Consequently, I feel compelled to write in this instance with a somewhat broader sweep, not to render an opinion where none is called for, but to draw together into some cohesive and orderly pattern for assessment the many and varied facets, both legal and philosophical, which have contributed to an endless confusion in this area of the law. Such an appraisal is not eased by some form of antiseptic resume of the circumstances of the case in order to make for more palatable reading. On the contrary, if the issue of obscenity is to be weighed fully and fairly, the facts raising such an issue warrant full factual recitation in their proper context without regard for the sensitivities of the reader.

## I.

### FACTS

The stipulated facts as to the Martinique are as follows: the lounge is located at 404 Westheimer Avenue in Houston. It has operated for sometime at that location selling beer and wine under a Texas liquor license to customers at competi-

tive prices without entertainment. In 1970, live entertainment in the form of nude dancers was installed. Weekly advertising in the Houston Chronicle and the Houston Post took the following form:[1]

MARTINIQUE Lounge

NOW AN ADDITIONAL 10 DAYS GRANTED BY THE COURTS

BOTTOMLESS

CONTINUOUS REVUE

★ 8 GIRLS ★ NO COSTUMES!

528-8580          404 WESTHEIMER

OPEN 7 DAYS WEEKLY

12 NOON TO 2 A.M.

[A4055]

On December 17, 1970, while on a routine investigation of the premises, uniformed police officers were informed of the presence of a nude female inside the Martinique Lounge. Two officers entered the lounge and observed a dancer "clad in boots, bikini bottoms and bikini tops" (Stipulation, page 1) dancing to a jukebox tune. Further observations by the officers revealed the dancer exiting, disrobing, and reappearing on the now dimly-lit stage in front of a mirror backdrop, nude but for her boots. Another dance ensued to a fast rock-and-roll tempo, following which the dancer left the stage and dressed in a nearby dressing room. The dances so observed were of the traditional "go-go" variety, and no splits, squats, touching of the sexual organs, or simulation of intercourse or climax occurred (Stipulations, page 2).

The evening's entertainment culminated in the arrest of certain employees of the Martinique for violations, of the aforementioned statutes.[2]

On the evening of December 19, 1970, a quite similar sequence of events transpired, again resulting in arrest[3] (Stipulation page 2 and 3).

1. Plaintiff Martinique's Exhibit 1, with the exception that the words "Now An Additional 10 Days Granted By The Courts" were inserted and retained in the original advertisement during the period that the temporary injunction was in effect.

2. Stipulations page 2:
   Jimmie Grubaugh, permitting indecent dance, permitting work without health certificates, remaining on the premises for purposes of lewdness.
   Anastasia Rossy, no health certificate, vagrancy.

   Deborah Morris, vagrancy.
   Barbara Arey, vagrancy.
   Mary Espinoza, indecent dance.

3. Stipulations page 2 and 3:
   Jimmie Grubaugh, permitting lewd dance, permitting work without health certificate.
   Rose Thompson, indecent and immodest dance, no health certificate.
   Anastasia Rossy, indecent and immodest dance.
   Barbara Arey, indecent and immodest dance.

The My-O-My Club is located at 534 Westheimer Avenue in Houston. It was only recently opened in November, 1970, for the licensed sale of alcoholic beverages and live entertainment of the customers featuring nude dancers. The admission charge was $3.00 with the cost of beer and wine being $1.55. The My-O-My Club was advertised regularly in the Houston Chronicle with the advertising taking the following forms: [4]

[A4054]

[A4052]

Shirley Farrar, indecent and immodest dance.

On both December 17 and December 19, cash bonds were made, and all people charged were released the morning after their arrest.

4. See plaintiff My-O-My's exhibits 1 and 2 with attached affidavit.

Wednesday, January 20, 1971

[A4051]

[A4053]

On the night of December 31, 1970, Officer J. G. Perez of the Houston Vice Squad was assigned to work the club under cover. The My-O-My features a raised stage with a pole in the center, the stage being surrounded by numerous abutting tables. On stage at the time the officer arrived was a female dancer, nude except for a pair of gold slippers. In lieu of any particular dance style, she paced the floor to the rhythm of the music, stopping to accept money from the club patrons seated around the stage, and placing it in a large pitcher labeled "Geni". In deposition testimony, Officer Perez noted the following activities:

Q. [Mr. Wayne Paris, City of Houston Legal Department]
And without going too deep into a narrative, what would actually occur when they did place money in front of them?

A. [Officer Perez]
She would then approach that one certain customer and then she would lay down on the floor in front of him and then she would simulate all kinds of—simulate sexual intercourse is what she was doing.

Q. Did she have any clothes on at this time, other than the gold slippers, that you mentioned before?

A. No clothes. Still completely nude.

Q. Now, you say simulate sexual intercourse. Could you define that a little more? Could you be a little more specific? Was she

spreading her legs apart or just what as far as body movements are concerned?

A. She would spread her legs apart and move herself up and down. She would place her legs on the customer's shoulder—placing one leg on each shoulder of the customer and then she would pull herself up towards the customer's face with her legs and would work herself to where her privates or her vagina was about six or eight inches away from the customer's face.

Q. How many customers did she do this with?

A. Oh, at least six of the customers that had placed money up there that she did that to.

Q. And you observed all six?

A. Yes. Also I observed her at other times when the customers would, out of the beer bottle they were drinking, they would take out a dollar and stick it in the neck of the bottle and then she would walk up to where this particular customer was and she would lay down on the floor and with her legs strattle [sic] the bottle, and then she would work herself up to the beer bottle with them, and then with her vagina would pull the dollar out of the beer bottle.

Q. Did you observe any other kind of activity of this sort that you can recall?

A. Well, there was a pole in the center of the stage that looks like a building support and she would go up the pole and simulate her body as if again, in intercourse.[5]

At 10:00 p. m. the officer left, returned to the Vice office and began his investigation report.

The following night Officer Perez again visited the club, still under cover, and observed much the same activity, with the exception of two noteworthy events: the presence of several "drunks" who "kept hollering at the girls to take it off," [6] (Deposition of Officer Perez, page 20) and an alleged attempt by one of the patrons at oral sodomy.[7] At 10:00 the club was raided by the vice squad, who proceeded to take the names of the patrons, arresting several who appeared intoxicated, after a short scuffle. Mr. Wells, the owner, waitresses and dancers also were arrested.

At the hearing before the three-judge court, the above referred to stipulation was introduced by counsel for Martinique. The live testimony concerning the dance related solely to the circumstances of the arrest at the My-O-My Club. The offer of My-O-My's counsel to view the dance at the club was declined by the Court in view of the detailed deposition testimony of the arresting officer as well as that of one of the dancers which, while by no means as explicit, did not directly refute the arresting officer's version. Subsequent live testimony of the arresting officer at the hearing as well as that of a corroborating witness from the Texas Alcoholic Beverage Commission, Mr. David Floyd, confirmed in all material respects the nature of the dance and circumstances under which it was performed. (Tr. at 51–53).

5. Deposition of Officer Perez at 13–14.

6. Deposition of Officer Perez at page 20:
   A. This one person that was intoxicated kept hollering to take it off, and at one time the dancer took her shoe off, because that was the only thing she was wearing.

7. *Id.* at 21:
   A. Again, she came to the customer sitting next to me and she laid down on the floor and put her feet on the customer and kept working herself up until she had her privates about six or eight inches away from the customer. This one particular customer stuck his tongue out as if to commit oral sodomy on the dancer and she backed away.

Testimony at the hearing also included that of the head of the Vice Squad of the Houston Police Department, Lt. J. D. Belcher, who testified as to the methods employed by the Vice Squad in obtaining procedural guidelines to be followed in making such arrests. (Tr. at 80–83, 86, 107). These included frequent contacts with the State District Attorney and his legal staff relative to what facts and circumstances might constitute a violation under State law which could be successfully prosecuted. This testimony clearly detailed the coordinated efforts of the law enforcement officers and eliminated any sound contention that the actions of the arresting officer and his superiors were arbitrary and without the benefit of the considered opinion of the District Attorney's office. (Tr. at 80–83, 86).

On December 22, 1970, a temporary restraining order was issued, enjoining any further enforcement of the Texas Penal Code Ann. arts. 667–19B (b) and (g) and 607 § 18 (1954), and § 36–43 of the City of Houston Municipal Code against the Martinique, its owner and employees until January 1, 1971. The My-O-My Club was permitted to intervene on January 5, and was similarly protected by the order as extended.[8]

## II.

### SCOPE OF INQUIRY

The scope of the Court's inquiry must extend not only to a determination of whether the dances as presented constituted obscenity *vel non*, which requires considerable case analysis, but also must include a determination of whether the Texas statutes which purport to regulate obscenity are sufficiently precise so as to satisfy constitutional requirements including the providing of adequate warning, a satisfactory standard of action for the unwary, Winters v. New York, 333 U.S. 507, 509, 68 S.Ct. 665, 92 L.Ed. 840 (1948); Cantwell v. Connecticut, 310 U.S. 296, 308, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), and are procedurally sound under the *Freedman* doctrine.[9]

The first area of inquiry is not an easy one. As was pointed out by Mr. Justice Harlan in Interstate Circuit, Inc. v. Dallas, 390 U.S. 676, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968), anyone who undertakes to examine the Supreme Court's decisions since Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) which have held particular material obscene or not obscene would find himself in utter bewilderment. Chief Justice Warren and Mr. Justice Clark further conceded in Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964), that Supreme Court opinions since *Roth* have failed to furnish guidelines to lower courts. In thirteen decisions handed down by the Court between 1958 and 1968 there have been fifty-five separate opinions expressed by the Justices. Adler v. Pomerleau, 313 F.Supp. 277, 284 (D.Md.1970). In three of the critical decisions of the Court which will be discussed below, there are fourteen separate opinions.[10] The obvious consequence of such a splintering of viewpoints on the obscenity issue has been that there are very few decisions which are joined in by a majority of the Court so as to constitute binding legal precedents for lower courts to follow.

The law as to what constitutes a binding legal precedent of the Supreme Court is important. Some cases have referred to its significance,[11] but there is no way

---

8. The order was extended several times, to run until such time as the Court may enter its ruling.

9. Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

10. Mishkin v. New York, 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966); Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966); A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966).

11. *See, e.g.,* Wagonheim v. Maryland State Bd. of Censors, 255 Md. 297, 258 A.2d 240, 251–252 (Ct.App.1959) (con-

to assess to what extent this point has received consideration in the vast majority of the lower court opinions with their divergent views. It is a well established rule that a majority of the Court rendering a decision must concur, not only in the result, but also in the opinion or legal reasoning for that result, before the case can be considered within the rule of *stare decisis*.[12]

In 20 Am.Jur.2d Courts § 195 the full breadth of this significant rule is well stated:

> Although there are cases indicating that a decision by a divided court does not have stare decisis effect, and cases to the effect that a mere majority decision does not have the weight of a unanimous decision, the prevailing view seems to be that a decision not rendered unanimously does not by this lack of unanimity lose its character as a precedent within the scope of stare decisis, provided the required majority of the court concurred in the decision. A decision by an equally divided court does not establish a precedent required to be followed under the stare decisis doctrine. And where the members of the court unanimously or by majority vote reach a decision but cannot, even by a majority, agree on the reasoning therefor, no point of law is established by the decision and it cannot be a precedent covered by the stare decisis rule. (Footnotes omitted)

More specifically, an opinion is not authoritative or controlling as to any principle of law where only three judges concurred in the opinion, three others dissented and another concurred only in the decision. United States v. Pink, 315 U.S. 203, 216, 62 S.Ct. 552, 558, 86 L.Ed. 796 (1942). In *Pink* the Court opinion by Mr. Justice Douglas stated:

> Nor was our affirmance of the judgment in that case by an equally divided court an authoritative precedent. While it was conclusive and binding upon the parties as respects that controversy * * *, the lack of an agreement by a majority of the Court on the principle of law involved prevents it from being an authoritative determination for other cases. Hertz v. Woodman, 218 U.S. 205, 213, 214, 30 S.Ct. 621, 622, 54 L.Ed. 1001.

### III.

### THE CASE LAW ON OBSCENITY

The language of the First Amendment that "No law shall be passed abridging freedom of speech or of the press * * *" has not been restricted to its literal meaning in Court decisions. The term "speech" as an individual expression or communication of ideas has been assumed prima facie to enjoy constitutional protection. But as one moves from pure utterances by an individual in the direction of action or conduct, the line of demarcation as to what is protected loses clarity and eventually its constitutional mantle. Thus, a showing that the expression involved is "speech plus" or symbolic speech resulting in the activity being subject to a substantial governmental interest can result in a loss of such protection, even though such regulation incidentally curtails or impinges upon the First Amendment. *See* United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Of course, once the activity can be characterized unqualifiedly as conduct outside the First Amendment frame of ref-

curring opinion); State v. Reese, 222 So.2d 732, 737 (Fla.Sup.1969) (concurring opinion); Cain v. Commonwealth, 437 S.W.2d 769, 771–772 (Ky.Ct.App. 1969), rev'd per curiam, 397 U.S. 319, 90 S.Ct. 1110, 25 L.Ed.2d 335 (1970). *Accord*, ABC Books, Inc. v. Anderson, 8 Crim.L.Rptr. 2414 (M.D.Tenn. Jan. 20, 1971). *But see* Karalexis v. Byrne, 306 F.Supp. 1363, 1365, (D.Mass.1969), where, in footnote treatment, the majority of the court, while alerted to this rule, saw fit to ignore it on the theory that majority concurrence of the Supreme Court in the result was sufficient.

12. 21 C.J.S. Courts § 189 (1940).

erence, it is properly regulated under the "police power" of the state.[13]

Although there is reason to have serious doubts that the activities in question in this case, the nude dancing and related activities in their respective settings in the cocktail lounges, qualify in any sense for constitutional protection as a form of speech expressing or communicating ideas, this is the thesis of the plaintiffs in this case. Consequently, this position will be explored in some depth to determine its legal validity *vel non*. However, even if it is assumed prima facie that the dances are some form of speech, this protected status is not absolute and can still be lost upon a showing of obscenity, the definition of and presence or absence of which constitute the nub of this lawsuit.

Another aspect of this complex area of the law merits preliminary comment. First Amendment protection has been extended not only to communications of political import, but also to expressions intended for amusement and entertainment. Winters v. New York, 333 U.S. 507, 510, 68 S.Ct. 665, 92 L.Ed. 840 (1948); Weaver v. Jordan, 64 Cal.2d 235, 242, 49 Cal.Rptr. 537, 542, 411 P.2d 289, 294 (1966).

[T]he First Amendment reaches beyond protection of citizen participation in, and ultimate control over, governmental affairs and protects in addition the interest in free interchange of ideas and impressions for their own sake, for whatever benefit the individual may gain.

In re Giannini, 69 Cal.2d 563, 72 Cal. Rptr. 655, 660, 446 P.2d 535, 540 n. 3 (1968). Accordingly, whatever the medium, and whether the communication is a humorous interpretation of the foibles, a sensitive expression of the beauty, or a cryptic comment on our political, social or sexual mores, the communication prima facie warrants protection. But when the material imparted is salacious and sensationalist for the sake of being so—designed to appeal to that "prurient interest" which is discussed at such length in the cases—its privileged status is lost. It has also been held that the element of commercial profit is no basis for depriving material of constitutional protection.[14] However, when the purveyors of such material commercially exploit or deliberately represent their communications as appealing to the prurient interest of its intended and probable recipient group, that fact may be decisive in the determination of obscenity.[15]

In terms of the factual application of First Amendment protection, there has

---

13. The distinction between speech or expression and action or conduct has not been seriously disputed by the Justices of the Supreme Court, even by those who rigidly reject any curtailment of freedom of speech or expression in the obscenity areas. "Whatever may be the reach of the power to regulate *conduct*, I stand by my view in Roth v. United States, supra, that the First Amendment leaves no power in government *over expression of ideas*." Justice Douglas in A Book Named "John Cleland's Memoirs of a Woman of Pleasure", 383 U.S. at 433, 86 S.Ct. at 985; "I assume there is nothing in the Constitution which forbids Congress from using its power over the mails to proscribe *conduct* on the grounds of good morals. No one would suggest that the First Amendment permits nudity in public places, adultery, and other phases of sexual misconduct." Justice Douglas, with whom Justice Black con-

curs, dissenting in *Roth*, 354 U.S. at 512, 77 S.Ct. at 1323; "I think the Founders of our Nation in adopting the First Amendment meant precisely that the Federal Government should pass 'no law' regulating speech and press but should confine its legislation to the regulation of conduct. So too, that policy of the First Amendment made applicable to the States by the Fourteenth, leaves the States vast power to regulate conduct but no power at all, in my judgment, to make the expression of views a crime." Justice Black in dissent in Mishkin v. New York, 383 U.S. at 518, 86 S.Ct. at 969.

14. Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 501–502, 72 S.Ct. 777, 96 L.Ed. 1098 (1952).

15. Ginzburg v. United States, 383 U.S. 463, 466, 470, 86 S.Ct. 942, 16 L.Ed. 2d 31 (1966).

been a gradual expansion. The literal terminology "freedom of speech and press" has included books,[16] picture magazines,[17] and still photographs.[18] It has been held to apply to motion pictures, although with some qualifications.[19] More recently, lower federal courts and state courts have considered the issue of constitutional protection of the live theater [20] and topless dancing in cabarets.[21] The present fact situation is but another mutation which serves to raise the question once again as to where the constitutional line should be drawn, or if the attitude of our society has now reached the point where none should be drawn at all. This philosophical cleavage cannot be ignored in this area of the law, and, indeed, it manifests itself most sharply in the respective attitudes of the members of the Supreme Court as reflected in the Court's decisions. While these pronouncements have left lower courts in a state of bewilderment,[22] no satisfactory understanding of the extent of the futility facing lower courts in coping with this problem can be obtained without some analysis of the present legal dilemma and how it came about. At the risk of prolonging this opinion unduly, I reach the conclusion that the complete panorama of this area of the law can be discerned only through a chronological review of certain of the major court pronouncements, particu-

larly those of the Supreme Court since 1957.

Commencing with the English case of Regina v. Hicklin, L.R. 3 Q.B. 360 (1868), the jurisprudence in this country pertaining to obscenity has followed a controversial course. *Hicklin* stood for the proposition that material could be judged merely by the effect of an isolated excerpt upon particularly susceptible persons. This rule was vulnerable in two obvious areas, the use of "those whose minds are open to such immoral influences" as a measure of obscenity instead of referring to the average person in the community, and the employment of a standard of evaluating obscenity by looking to an isolated segment of the material instead of judging the work in its entirety. These factors were considered and resolved some fourteen years ago in the landmark case of Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

## A.

### ROTH v. UNITED STATES

The celebrated *Roth* case, a (5–1–1) (2) [23] opinion of the Court, was actually two cases, *Roth* dealing with the constitutionality of a federal statute regulating the mailing of obscene matter and the other, Alberts v. California, pertaining to a state statute regulating the sale

16. A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966).

17. Winters v. New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948).

18. Hunt v. Keriakos, 428 F.2d 606 (1st Cir. 1970).

19. Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952). Compare Wagonheim v. Maryland State Bd. of Censors, 255 Md. 297, 258 A.2d 240, 249-250 (Md.Ct.App.1969) *with* Karalexis v. Byrne, 306 F.Supp. 1363 (D.Mass.1969), vacated and remanded 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971). *See* Interstate Circuit, Inc. v. Dallas, 390 U.S. 676, 690, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968).

20. P.B.I.C., Inc. v. Byrne, 313 F.Supp. 757 (D.Mass.1970).

21. In re Giannini, 69 Cal.2d 563, 72 Cal. Rptr. 655, 446 P.2d 535 (1968).

22. Interstate Circuit, Inc. v. Dallas, 390 U.S. 676, 707, 88 S.Ct. 1298, 20 L.Ed. 2d 225 (1968) (concurring opinion).

23. Due to the great importance that the division in legal philosophy among the Justices plays in this area, the notation as to opinions filed is made reflecting each separate opinion rather than merely the number of Justices on the majority, concurrence and dissent. Thus, the notation (5–1–1) (2) should be read: (Majority of 5—concurring opinion—concurring opinion) (2 in joint dissent).

and advertising of obscene books. *Roth* squarely confronted the Supreme Court with the issue of whether obscenity is an expression or utterance within the area of protected speech and press. The Court held that it was not. With Mr. Justice Brennan writing the opinion, the test of obscenity was held to be "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest".[24] The definition of prurient interest set forth in *Roth* is contained in a footnote wherein the Court states that:

> We perceive no significant difference between the meaning of obscenity developed in the case law and the definition of the A.L.I., Model Penal Code, § 207.10(2) (Tent. Draft No. 6, 1957), viz:
>
> '* * * A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest, i. e., a shameful or morbid interest in nudity, sex, or excretion and if it goes substantially beyond customary limits of candor in description or representation of such matters. * * * '[25]

Also contained in the footnote are more basic, graphic definitions such as "material having a tendency to excite lustful thoughts" and "itching; longing; uneasy with desire or longing".

In discussing the concept of obscenity, the Court opinion stated that "[A]ll *ideas* having even the *slightest redeeming social importance* * * * have the full protection of the guaranties * * *. But implicit in the history of the First Amendment is the *rejection of obscenity as utterly without redeeming social importance.*"[26]

The above language seems innocent enough, but it has been a subject of end-

less dispute, as will appear in the subsequent discussion of Jacobellis v. Ohio[27] and A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts.[28] With these observations made as to *ideas*, the Court in *Roth*, 354 U.S. at 485, 77 S.Ct. at 1309, cited with approval the following language in Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031:

> There are certain well defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the *lewd and obscene* * * *. It has been well observed that *such utterances* are *no essential part* of any exposition *of ideas*, and are of *such slight social value as a step to truth* that any benefit that may be derived from them is *clearly outweighed by the social interest in order and morality* * * *. (emphasis supplied)

From the above quotations contained in *Roth* including that from *Chaplinsky*, it is clear that *ideas* with the slightest redeeming social importance are constitutionally protected,[29] but that obscene utterances *are not ideas in the constitutional sense,* even though they may have some slight social value in ascertaining truth. To determine obscenity *vel non* according to *Roth*, the prurient interest test is applied. Once material is found to be obscene under such a test, it no longer is a constitutionally protected utterance and is consequently viewed as utterly without redeeming social importance.

In subsequent cases, the *Roth* test of prurient interest has had engrafted upon it at least two additional prongs or tests to be used to determine obscenity. These are (1) that the material is patently of-

---

24. 354 U.S. at 489, 77 S.Ct. at 1311.

25. 354 U.S. at 487 n. 20, 77 S.Ct. at 1310.

26. *Id.* at 484–485, 77 S.Ct. at 1309 (emphasis added).

27. 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed. 2d 793 (1964).

28. 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed. 2d 1 (1966).

29. Although Mr. Justice Douglas dissented in *Roth*, he had no quarrel with the concept that First Amendment protection was meant to encompass the expression of ideas. *See* n. 13, *supra.*

fensive as affronting contemporary community standards and [30] (2) that the material is utterly without redeeming social value.[31] It is the latter test which presumably finds its genesis in the above quoted language in *Roth*. Apart from other criticisms of the social importance or social value test that can be made, the above cited language in *Roth* and *Chaplinsky* does not support such a test. "Utterly without redeeming social importance" is the nature of the conclusion reached following the determination that matter is obscene; it is not the language of a separate test itself to be used to ascertain obscenity. To utilize an obvious conclusion as such a test is to indulge in a non-sequitur in which the premises and conclusion are inverted. The crucial significance of this interpretation of the *Roth* and *Chaplinsky* rationale of obscenity will become more apparent, as the evolution of this body of law and the contributions of certain subsequent Supreme Court cases, particularly Memoirs, are analyzed.

## B.

## MANUAL ENTERPRISES, INC. v. DAY

The other test engrafted upon *Roth* in which, in addition to the prurient interest inquiry, the Court or jury ascertains that "the material is patently offensive as affronting contemporary community standards," stems from the subsequent decision of Manual Enterprises, Inc. v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962). Admittedly more of a variant of the *Roth* standard than a separate and distinct test, it is also true that this was not a majority decision of the Court. The Justices again were unable to agree on the grounds for reversal, splitting (2–3–1) (1) with two Justices not participating

in the decision. A Federal mail statute was involved, the material sent through the mails being composed primarily, if not exclusively, of magazines for homosexuals containing nude male photographs. Mr. Justice Harlan, with the concurrence of Mr. Justice Stewart, announced the judgment of the Court with three other Justices concurring on other grounds.

After recognizing that *Roth* established the single test of "prurient interest", Mr. Justice Harlan pointed out that a necessary concurrent test was required if, in addition, the material goes "substantially beyond customary limits of candor in describing or representing such matter." This is the same language used to define obscenity by the A.L.I. Penal Code which was approved in *Roth* in a footnote.[32] This test was given a shorthand rendition of "patent offensiveness" in *Manual Enterprises*, and both prurient interest and patent offensiveness were seen as necessarily joining or coalescing before the challenged material could be found to be obscene under the Federal statute.[33] Although it was observed that in most instances material which is patently offensive will also usually carry the requisite "prurient interest" appeal, this situation did not occur in *Manual Enterprises*. The magazines with nude male photographs catered only to homosexuals, a particular class of persons, which precluded the broad application of the "contemporary community standard" formula utilized under the "prurient interest" test in *Roth* to ascertain obscenity. When such a special class was involved which constituted less than the community as a whole, an independent inquiry as to "patent offensiveness" was thought to be necessary. Thus, while the two tests overlapped or were indistinguishable in most instances, it was felt that both

30. Manual Enterprises, Inc. v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962).

31. A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975,

16 L.Ed.2d 1 (1966); Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed. 2d 793 (1964).

32. 354 U.S. at 487 n. 20, 77 S.Ct. 1304, 1310.

33. 370 U.S. at 485–486, 82 S.Ct. 1432.

necessarily had to be satisfied under the facts of Manual Enterprises, Inc. v. Day. As a consequence, a second test of obscenity was referred to in later Supreme Court opinions, despite the fact that it lacked the sanction of a majority of the Court.[34]

### C.
### JACOBELLIS v. OHIO

The next case of significance, Jacobellis v. Ohio,[35] involved a conviction under a state statute for the exhibition of an obscene motion picture. Six of the Justices voted for reversal, but again they could not agree upon an opinion, splitting (2–2–1–1) (2–1). The significance of *Jacobellis* is to recognize the sharp cleavage in the Court as to what constitutes the "community standard" to be used in applying the *Roth* test. Two Justices, Brennan and Goldberg, believed that a national standard should be applied, whereas two others, Warren and Clark, believed that there was no provable national standard and that the community requires application of more local standards. There is still no Supreme Court opinion on the point at this time.

It is of further interest to note that in *Jacobellis* two of the Justices, Black and Douglas, reiterate the absolutist position to which they rigidly adhere throughout these cases that there should be no limitations whatsoever placed on First Amendment rights. Further, they state that if "this Nation is to embark on * * censorship, * * * this [Supreme] Court is about the most inappropriate Supreme Board of Censors that could be found." [36]

If the employment of the term "social value" as opposed to "social importance" in *Roth* was ever thought to possess some esoteric distinction, it was dissipated in *Jacobellis*. Mr. Justice Brennan, who wrote the majority opinion in *Roth*,

stated that "[W]e would reiterate, however, our recognition in *Roth* that obscenity is excluded from the constitutional protection only because it is 'utterly without redeeming social importance.'" [37]

### D.
### A BOOK NAMED "JOHN CLELAND'S MEMOIRS OF A WOMAN OF PLEASURE" v. MASSACHUSETTS

A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966) was a suit over a book which was declared obscene by the Massachusetts courts under a state statute. The Supreme Court reversed, but once again there was no agreement on a Court opinion. In this instance the division of the Court was (3–1–1–1) (1–1–1), with the last three opinions constituting separate dissents.

As was pointed out in the previous discussion of *Roth* and *Jacobellis*, *Memoirs*, which actually constitutes no legal precedent as a Supreme Court opinion, is frequently cited in support of the third independent test or prong that must be satisfied for material to be characterized as obscene, that is, that the material be "utterly without redeeming social value." In *Memoirs* "social importance" as pronounced in *Jacobellis* makes the full transition to a constitutional test of "social value" when it is stated "A book cannot be proscribed unless it is found to be *utterly* without redeeming social value. * * * Hence, even on the view of the court below that *Memoirs* possessed only a modicum of social value, its judgment must be reversed as being founded on an erroneous interpretation of a federal constitutional standard." [38] The rationale was that under *Roth* "as elaborated in subsequent cases",[39] the

34. The Fifth Circuit has interpreted *Manual Enterprises* as not intended to add to the *Roth* definition a separate element "patent offensiveness". Chemline, Inc. v. City of Grand Prairie, 364 F. 2d 721, 726–727 (5th Cir. 1966).

35. 378 U.S. 184, 84 S.Ct. 1676 (1964).

36. *Id.* at 196, 84 S.Ct. at 1682 (dissent).

37. *Id.* at 191, 84 S.Ct. at 1680.

38. 383 U.S. at 419–420, 86 S.Ct. at 978.

39. *Id.* at 418, 86 S.Ct. 975.

test of obscenity was three-pronged: (1) the material must appeal to prurient interest; (2) be patently offensive and (3) be utterly without redeeming social value. The prevailing opinion stated that even if (1) and (2) were satisfied, failure to meet (3) would be sufficient to defeat any characterization of the material as obscene.

Thus, once material had been characterized as obscene under the "prurient interest" test in *Roth* and therefore not constitutionally protected, the conclusion of *Roth* had become a separate, independent test of its own;—was the material in question utterly without redeeming social value?—and this test, if not unqualifiedly satisfied, was held to be sufficient to defeat any determination of obscenity regardless of whether the "prurient interest" test and its offshoot, the "patently offensive" test, were fully met.

Some insight into the difficulties experienced by the Court is discernible, particularly in the dissenting opinions of Justices Clark and White. Both agreed that the formulation of such an "utterly without redeeming social value" test rejected the basic holding of *Roth*.[40] As Mr. Justice Clark pointed out, his vote was the deciding one in the majority opinion in *Roth* and was cast solely because the obscenity test was "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest."[41] Mr. Justice Clark thereafter cited *Chaplinsky*[42] and stated that in no subsequent court decision of the Supreme Court following *Roth* had any "utterly without redeeming social value" test been suggested, much less expounded.[43]

The first reference to such a test is actually in *Jacobellis*, not a Supreme Court majority opinion, where the recitation is that "recognition in *Roth* that

obscenity is excluded from the constitutional protection only because it is 'utterly without redeeming social importance * * *'."[44] Actually *Roth* did not say this; what *Roth* did say was that material determined to constitute obscene utterances under the prurient interest test was material without ideas and therefore without constitutional guaranties. Not because of a social importance or value test, but as a consequence of the prurient interest test in *Roth*, obscenity was concluded to be utterly without redeeming social importance and was therefore not extended First Amendment protection.

The dissent of Mr. Justice White capsuled the issue and the reasoning well and in proper sequence:

In *Roth* * * * the Court held a publication to be obscene if its predominant theme appeals to the prurient interest in a manner exceeding customary limits of candor. Material of this kind, the Court said, is *'utterly without redeeming social importance' and is therefore unprotected by the First Amendment.* (emphasis supplied)[45]

Both Justice Clark and Justice White saw the social importance or value test, not as an independent test of obscenity, but as relevant only to a determination of the predominant prurient interest of the material, a decision which a court or jury will make based on the nature of the material and the evidence in the case.[46]

The significance of *Memoirs* does not end with the advancement by only a plurality of the Court of a social importance or value test and the sharp reaction against such a test by two of the Justices who had participated in the majority opinion in *Roth*. The same plurality that fashioned this highly controversial, but subsequently utilized three-pronged test, then proceeded to carve

---

40.  *Id.* at 441 and 461–462, 86 S.Ct. 975.

41.  *Id.* at 441–442, 86 S.Ct. at 1311.

42.  Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

43.  383 U.S. at 442, 86 S.Ct. 975.

44.  378 U.S. at 191, 84 S.Ct. at 1680.

45.  383 U.S. at 460–461, 86 S.Ct. at 999.

46.  *Id.* at 445 and 462, 86 S.Ct. 975.

out an exception to this absolute prohibition of a determination of obscenity requiring the material to be "utterly without redeeming social value". This exception was that when there is evidence from the circumstances of production, sale and publicity that the book was commercially exploited solely for its prurient appeal to the exclusion of all other facts, the conclusion might still be reached that the book was utterly without redeeming social importance, even though the book possessed a minimum of social value.[47] In the case of *Memoirs*, the obscenity of the book was judged in the abstract without reference to other circumstances. But the indication is clear that there could be circumstances other than the social value of the material per se which might merit consideration in evaluating obscenity in other instances. The prevailing opinion rationalized that this is not really a relaxation of the test that the book must be "utterly without redeeming social value" to qualify as obscene. Rather, reference is made to Ginzburg v. United States,[48] a case decided the same day which concerned pandering, wherein the purveyor's sole emphasis on the sexually provocative aspects of his publication was accepted by the Court as his evaluation of his own material.[49] Thus, outside factors including the context in which the activity took place would be considered. However, the primary difficulty still remained. The non sequitur from which the utterly without redeeming social value test evolved precluded any determination of obscenity if there was any support at all for the material in question.

The analysis by Mr. Justice Harlan in dissent of this exception fashioned by a plurality of the Court in *Memoirs* pointed up this virtually impossible situation. It was his view that the tests of obscenity set out in the prevailing opinion created only an illusion of certainty and actually risked confusion and prejudice. Application of the social value test did not permit material to be "weighed against" or "canceled by" the first two tests of obscenity, that is, prurience or patent offensiveness; each had to be assessed separately; and all had to coalesce to permit a determination of obscenity. As Mr. Justice Harlan saw it, the "social value" test was impracticable of application, unless the testimony against the book or material was virtually uncontradicted. Any controversy of significance created a situation requiring a preponderance or other weighing test, and this was forbidden by the very language of the test; thus, as he put it, "it is very hard to see that the 'utterly without redeeming social value' test has any meaning at all." [50]

But that was not all. Mr. Justice Harlan went on. The prevailing view apparently "believes that the social value of the book may be negated if proof of pandering is present." If that is so, the use of the inherently vague pandering notion to offset social value "wipes out any certainty" that the "utterly without redeeming social value" test might be given through expert testimony.[51] Justice Harlan believed it much more satisfactory to concede in *Memoirs* that the book had some social merit and recognize at the same time that it may still be deemed salacious or obscene.[52]

### E.

### MISHKIN v. NEW YORK
### AND
### GINZBURG v. UNITED STATES

Two other decisions emanated from the Supreme Court on the same date as *Memoirs*, Mishkin v. New York, 383 U.S.

---

47. Ginzburg v. United States, 383 U.S. 463, 475–476, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966).

48. *Id.*

49. *Id.* at 470, 86 S.Ct. 942.

50. 383 U.S. at 459, 86 S.Ct. at 998.

51. *Id.*

52. *Id*; The Fifth Circuit, although not directly passing on the question, seems to indicate that a statute which has no language requiring a finding that material must have no redeeming social value would be constitutionally suspect. Phelper v. Decker, 401 F.2d 232, 240 (5th Cir. 1968).

502, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966) and Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966). They are of importance here insofar as they are able to shed some light on the vitality of the *Roth* test and the subsequent efforts to modify or obscure the "prurient interest" test in *Roth* by the "utterly without redeeming social value" test espoused by three Justices in *Memoirs*. Both *Mishkin* (5–1) (1–1–1) and *Ginzburg* (5) (1–1–1–1) are court opinions. In both majority opinions the *Roth* test was specifically referred to on numerous occasions, applied and upheld. On the other hand, in neither of the majority opinion was *Memoirs* or the "social value" test mentioned or footnoted. It is only in the dissenting opinion of Mr. Justice Black in *Ginzburg* that *Memoirs* is referred to [53] along with the sharp divergence of views set forth in that opinion as to what tests are required to determine when material is obscene.[54] As to the "utterly without redeeming social value" test, Mr. Justice Black also expressed reservations when he observed in *Ginzburg* that:

> [t]his element seems to me to be as uncertain, if not even more uncertain, than is the unknown substance of the Milky Way.

> \*    \*    \*    \*    \*    \*

My conclusion is that certainly after the fourteen separate opinions handed down in these three cases today no person, not even the most learned judge much less a layman, is capable of knowing in advance of an ultimate decision in his particular case by this Court whether certain material comes within the area of 'obscenity' as that term is confused by the Court today.[55]

### F.

### REDRUP v. NEW YORK

It was in 1967 that the next significant Supreme Court pronouncement was

forthcoming. Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967) was a per curiam opinion of seven Justices reversing the lower courts in three cases involving state statutes which regulated distribution of alleged obscene books and picture magazines. Although the Court was divided 7–2 for reversal, it is important to note the basis on which the per curiam opinion concluded: that "[w]hichever of these constitutional views is brought to bear upon the cases before us, it is clear that the judgments cannot stand." [56]

The per curiam opinion pointed out that two members of the Court consistently adhered to the view that a State had no power to regulate writings or pictures upon the ground of their obscenity.[57] These two Justices are Black and Douglas. The opinion went on to recite that a third Justice believed the state power is narrowly limited to a distinct class of material. This is Justice Stewart and his belief that only hard core pornography can be characterized as obscene.[58] Another Justice has not viewed the "social value" element as an independent factor in the judgment of obscenity. This is the position of Justice White.[59] Two Justices dissented in *Redrup*, Harlan and Clark. The per curiam opinion then stated somewhat cryptically that "[o]thers have subscribed to a not dissimilar standard, holding that a State may not constitutionally inhibit the distribution of literary material as obscene \* \* \*" unless the three tests of (1) appeal to prurient interest (2) patently offensive material which is (3) utterly without redeeming social value are present and coalesce, citing *Memoirs* as authority.[60] By process of elimination the other Justices are Brennan, Warren and Fortas who expressed the same plurality view in *Memoirs* which was a (3–1–1–1) (1–1–1) split of the Court. As has been pointed out, there was no ac-

---

53. 383 U.S. at 478 n. 2, 86 S.Ct. 942.

54. *Id.*

55. *Id.* at 480–481, 86 S.Ct. at 952–953.

56. 386 U.S. at 771, 87 S.Ct. at 1416.

57. *Id.* at 770, 87 S.Ct. 1414.

58. *Id.*

59. *Id.* at 771, 87 S.Ct. 1414.

60. *Id.* at 770–771, 87 S.Ct. at 1416.

tual Court "holding" in *Memoirs*, nor does *Redrup* add legal weight and thrust to these earlier cases. On the contrary, *Redrup* contains no majority reasoning in deciding a constitutional question, but serves only to point up the solidified divergent views espoused by the Court's members over a considerable period of time, none of which is supported by a majority.

In this context the summary citation of *Redrup* without further elaboration in various subsequent per curiam memorandum opinions of the Supreme Court is scarcely indicative of any philosophical decision to expand First Amendment protection.[61] Instead, its more obvious meaning from its very language is that, while there is agreement of a majority of the Court that a case should be affirmed or reversed, there is no such agreement at all as to the reasoning for reversal. Similarly, with divergent constitutional views expressed by the Justices in deciding upon reversal, the preliminary elimination of certain specific prohibitions—concern for juveniles, invasion of individual privacy and pandering under the facts in *Redrup* [62]—constitutes no new set of tests of obscenity to replace or obscure the vitality of the test pronounced in *Roth*. Rather, such factors can only constitute evidentiary matters which in a proper set of circumstances should be considered in determining obscenity *vel non*.

## G.

### STANLEY v. GEORGIA

Subsequent to *Redrup* the Supreme Court considered the issue of obscenity from a somewhat different viewpoint in Stanley v. Georgia, 394 U.S. 557, 89 S. Ct. 1243, 22 L.Ed.2d 542 (1969). This was a Court opinion in which the Justices divided (6) (3), holding that a state statute was unconstitutional in making a crime the private possession in the home of obscene matter in the form of 8mm home movies. The Court considered *Roth* and rejected its application to these facts, although the decision unqualifiedly recited that the holding in *Roth* was not impaired by this case.[63] *Roth* was not viewed as dealing with the precise point involved in *Stanley*, the mere private possession of obscenity in the confines of one's residence as opposed to its public distribution or dissemination.

Much has been made of *Stanley* by those who would broaden the constitutional protection afforded in obscenity cases. The theory has been advanced that the meaning of *Stanley* goes far beyond the plain language contained in the case which is that *Roth* and the cases following it remain intact and that the holding only protects an individual's right to be free from unwanted governmental intrusion of his privacy.[64] This novel approach has found recent support in certain lower court opinions

---

61. *See, e. g.*, Hoyt v. Minnesota, 399 U.S. 524, 90 S.Ct. 2241, 26 L.Ed.2d 782 (1970) ; Walker v. Ohio, 398 U.S. 434, 90 S.Ct. 1884, 26 L.Ed.2d 385 (1970) ; Cain v. Kentucky, 397 U.S. 319, 90 S.Ct. 1110, 25 L.Ed.2d 335 (1970).

62. 386 U.S. at 769, 87 S.Ct. 1414.

63. 394 U.S. at 568, 89 S.Ct. 1243.

64. Few opinions have reiterated a position more fully and clearly than Stanley v. Georgia. This is not a case to which *Roth* is applicable, since none of the Court's decisions involved prosecution for "private possession" of obscene materials. 394 U.S. at 561, 89 S.Ct. 1243. The private possession aspect is referred to in numerous ways in *Stanley* ; as, for example, "mere possession of printed or filmed matter in the privacy of a person's own home." *Id.* at 564, 89 S.Ct. at 1247, "free * * * from unwanted governmental intrusions into one's privacy", *Id.*, "the right to satisfy his intellectual and emotional needs in the privacy of his own home", *Id.* at 565, 89 S.Ct. at 1248, "the right to be free from state inquiry into the contents of his library", *Id.*, "statutes regulating obscenity * * * do not * * * reach into the privacy of one's own home", *Id.*, "a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch", *Id.*

which, of necessity, warrant examination at this juncture.

Karalexis v. Byrne, 306 F.Supp. 1363 (D.Mass.1969), saw *Stanley* as severely questioning the inviolate state of *Roth*. In the opinion of a three-judge court in which a temporary injunction was granted against prosecution of the film entitled "I Am Curious (Yellow)," the court stated:

> Yet, with due respect, *Roth* cannot remain intact, for the Court there had announced that 'obscenity is not within the area of constitutionally protected speech or press,' 354 U.S. at 485, 77 S.Ct. at 1309, whereas it held that Stanley's interest was protected by the First Amendment, and that the fact that the film was 'devoid of any ideological content' was irrelevant. (footnotes omitted)

*Id.* at 1366. The three-judge court felt that *Stanley* impaired *Roth* to the extent that restricted distribution, adequately controlled, was no longer to be condemned. As this three-judge court saw it, a logical and necessary reading of the right protected in *Stanley* would also extend to protect Stanley's professional supplier of film because the right to possess obscene materials in the home would be meaningless if there were no co-extensive right to produce them. Specifically, it was held that "[i]f a rich Stanley can view a film, or read a book, in his home, a poorer Stanley should be free to visit a protected theater or library. We see no reason for saying he must go alone." [65]

Still other courts have held that the right to enjoy erotica in the privacy of one's own home includes the right to get it there. Thus, in United States v. Dellapia, 433 F.2d 1252, (2d Cir. 1970), the conviction of a New York film collector under the Comstock Act for using the mails to exchange stag films with a California couple was reversed. A United States District Court issued a similar holding in United States v. Thirty-Seven Photographs, 309 F.Supp. 36 (C.D.Cal. 1970). This court, however, went much further in its construction of *Stanley*. The case involved the seizure of thirty-seven photographs carried by claimant in his personal luggage, during a customs inspection following a visit to Europe. The Government sought to enforce forfeiture of the photographs, and the claimant counter-claimed, contending that the photographs were not obscene and that the statute under which the photographs were seized was unconstitutional. Claimant admitted that it was his intention not only to possess the photographs privately, but also to incorporate the pictures into a book for distribution. Notwithstanding the possible commercial exchange of the photographs involved, this three-judge court held that the statute prohibiting all persons from importing obscene materials into the United States was unconstitutional in that it excluded photographs which were to be distributed to adults for use in the privacy of their own homes.[66] Necessarily, this lower court decided that *Stanley* effectively overruled the statement in *Roth* that obscenity is not within the protection of the First Amendment.

*Karalexis*, as a three-judge case was appealed directly to the Supreme Court, and there was anticipation that its disposition would resolve much of the confusion in this legal area. Recently, the Supreme Court issued its opinion in Byrne v. Karalexis, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (Feb. 23, 1971), a per curiam Court decision reversing the three-judge court. However, the reasoning relies on procedural matters which in

---

65. *Id.* at 1367.

66. The dissemination of ideas can accomplish nothing if otherwise willing addresses are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers.

The First Amendment cannot be construed to permit those who have funds for foreign travel to bring back constitutionally protected literature while prohibiting its access by the less affluent. *Id.* at 38.

no way serve to question or undermine the viability of *Roth*.

With the approach of the three-judge court in *Karalexis* and its progeny outlined above, the potent arguments to the contrary clearly warrant comment as well. Again, in view of the absence of Supreme Court authority, it becomes necessary to refer to lower court opinions.

A more conservative line of cases limits the significance of the holding in *Stanley* and accepts the Supreme Court's pronouncement in *Stanley* that the facts relate only to private possession of obscene material in the home. The Court of Appeals for the Fifth Circuit, in United States v. Fragus, 422 F.2d 1244 (5th Cir. 1970) and in its supplemental opinion, 428 F.2d 1211 (5th Cir. 1970), so stated and, in addition, expressly declined to adopt the rationale of the court in *Thirty-Seven Photographs*. In the supplemental opinion the court noted that the Supreme Court had affirmed the holding of a three-judge court in Gable v. Jenkins, 309 F.Supp. 998 (N.D.Ga. 1969) aff'd, 397 U.S. 592, 90 S.Ct. 1351, 25 L.Ed.2d 595 (1970) and, that Stanley v. Georgia did not invalidate a Georgia statute which prohibited the distribution of materials defined as obscene. The reasoning is of some interest. Since *Gable* affirms the permissibility of state intrastate regulations of obscene material, and since no logical distinction can be made as to federal interstate regulation, *Stanley* cannot be construed to legitimize the shipment of hard core pornography in interstate commerce in order to have it available for consumption in the privacy of one's home. The above pronouncement is actually dicta, since the issue before the Court was the propriety of arrest under ordinary criminal processes without a prior judicial determination of obscenity of the material possessed by defendants. The Court in *Fragus,* as in Milky Way Productions, Inc. v. Leary, 305 F.Supp. 288 (S.D.N.Y.1969), aff'd, 397 U.S. 98, 90 S.Ct. 817, 25 L.Ed. 2d 78 (1970), distinguished the case at

hand from mass seizures of allegedly obscene writings where no prior judicial determination of obscenity has been effected, A Quantity of Copies of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964); Marcus v. Search Warrants, etc., 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961). The seizures in *Fragus* and in *Milky Way* were not quantity seizures, but merely seizures "of instrumentalities and evidence of the crime for which appellants were indicted and lawfully arrested." [67]

The same conclusion as to the meaning of *Stanley* was reached in United States v. Melvin, 419 F.2d 136, 139 (4th Cir. 1969), wherein the court stated that in that case "the Supreme Court merely struck down a statute as unconstitutional insofar as it made criminal the mere private possession of obscene material in one's own home." It did not pertain to the congressional power to regulate interstate transportation of obscene material by statute which was at issue in *Melvin.*

The continued viability of *Roth* has been recognized. In Palladino v. McBrine, 310 F.Supp. 308 (D.Mass.1970), the convicted seller of obscene magazines urged *Karalexis* as a basis for the proposition that *Stanley* had overruled *Roth*. The Court rejected the argument, citing the precise language of *Stanley* that "*Roth* and the cases following that decision are not impaired * * *." The Court pointed up the distinction made in *Stanley* that *Roth* and similar cases related to public commercial dissemination of obscene material, not private possession within the confines of an individual's home.[68] *See also* United States v. Ten Erotic Paintings, 311 F.Supp. 884 (D.Md.1970), in which the views in *Melvin* and *Karalexis* were analyzed and compared, with the court deciding to follow the interpretation of the former. Of course, in no opinion is *Karalexis* more thoroughly taken to task than in the dissenting opinion in that very case.[69] For further similar interpretation of *Stanley*,

67. 428 F.2d at 1212.

68. 310 F.Supp. at 310.

69. 306 F.Supp. at 1368.

see ABC Books, Inc. v. Benson, 315 F. Supp. 695, 701 (M.D.Tenn.1970); United States v. A Motion Picture Film Entitled "Pattern of Evil", 304 F.Supp. 197, 200 (S.D.N.Y.1969) and Delta Book Distributors, Inc. v. Cronvich, 304 F.Supp. 662, 676, (E.D.La.1969), rev'd. in part, vacated and remanded in part sub nom., Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971).

There are certain other factors of overriding importance which possess Supreme Court sanction and lay a predicate for an understanding of the State interest in the obscenity area. One of these is to lay to rest any validity to the contention that the element of morality has no place in the decisions in this area of the law. The government interest in regulating obscenity was apparent in *Roth*, in which the majority opinion cited Chaplinsky v. New Hampshire, to the effect that "any benefit that may be derived from them [the obscene utterances] is clearly outweighed by the social interest in order and morality * * *." [70] While dissenting on other grounds in *Roth*, Mr. Justice Harlan fully agreed with the majority on this point when he stated that "pornography can induce a type of sexual conduct which a State may deem obnoxious to the moral fabric of society," [71] and "the domain of sexual morality is pre-eminently a matter of state concern * * *." [72] This viewpoint is fully evident also in the opinion of the majority of the Supreme Court in *Stanley*, where it was underscored once more that "*Roth* and its progeny certainly do mean that the First and Fourteenth Amendments recognize a valid governmental interest in dealing with the problem of obscenity." [73] While recognizing that *Stanley* did not warrant *Roth* treatment because it involved an in-

dividual's private possession of obscene movies in his own home as opposed to commercial distribution, the Court clearly drew the distinction by stating the following:

Whatever the power of the state to control *public* dissemination of ideas inimical to the *public morality,* it cannot constitutionally premise legislation on the desirability of controlling a person's *private* thoughts. (emphasis supplied) [74]

This view is not a new one and is also found in respected lower court opinions. In United States v. Levine, 83 F.2d 156, 157 (2d Cir. 1936), Judge Learned Hand observed, in an obscenity case decided over thirty-five years ago, that the problem was "to find a passable compromise between opposing interests," one of which was satisfaction of "the *moral demands of the community.*" (emphasis added)

*Roth* dealt with public distribution of obscene matter as opposed to individual private possession in the home found in *Stanley.* Such distribution or possession with intent to sell or distribute was also an issue in *Mishkin,* [75] *Ginzburg,* [76] *Jacobellis,* [77] and *Redrup,* [78] among others. As was pointed out in *Stanley,* "none of this Court's decisions subsequent to *Roth* involved prosecution for private possession of obscene materials. Those cases dealt with the power of the State and Federal Governments to prohibit or regulate certain public actions * * *." [79]

Despite the fact that the state interest in regulation of public morality including obscenity was established in Supreme Court opinions, the "rich Stanley—poor Stanley" argument advanced in *Karalexis* was eased into a newly self-created third area located somewhere between

70. 354 U.S. at 485, 77 S.Ct. at 1309.

71. *Id.* at 501–502, 77 S.Ct. at 1318.

72. *Id.* at 502, 77 S.Ct. at 1318.

73. 394 U.S. at 563, 89 S.Ct. at 1246–1247.

74. *Id.* at 566, 89 S.Ct. at 1249.

75. 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966).

76. 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966).

77. 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964).

78. 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967).

79. 394 U.S. at 561, 89 S.Ct. at 1245–1246.

the privacy of the home on the one hand and the public society sector on the other. Here, restricted distribution of obscenity, when adequately controlled, was concluded to be no longer condemned.[80] Whatever else might be said in opposition to this innovation, it is totally without support from Supreme Court opinions in this area of the law. Nor is any case in point cited. Although the Constitution protects the individual right to receive information and ideas, regardless of their social worth, this right pertains to private consumption. That is what *Stanley* held.[81] When an individual moves from the private confines of his home into the stream of society or community activity, the power of the state to regulate the public morality becomes significant and is frequently paramount. This regulatory power applies to the activity of Stanley's supplier as well as to the distributor of obscenity in *Thirty-Seven Photographs*, not for arbitrary reasons, but as a consequence of the fact that in the constant interplay between the individual desire as opposed to the public good in society, such individual activity is clearly outweighed by the social interest in order and morality.[82] In fact, *Stanley*, recognized that "*Roth* and the cases following it discerned such an 'important interest' in the regulation of commercial distribution of obscene material."[83] It further recognized the power of the State to control public dissemination of ideas inimical to the public morality.[84]

## H.
## SUPREME COURT MEMORANDUM OPINIONS SINCE REDRUP

The relevant Supreme Court cases since Redrup with the exception of *Stanley,* which does not involve public or state regulation of obscenity, have been memorandum opinions for the most part. Such brief pronouncements have generally cited *Redrup* as a basis for reversal or affirmance. Examination of certain of these cases [85] casts some semblance of light on the general attitude of the Court including that of the newest members, Chief Justice Burger, and Mr. Justice Blackmun. Cain v. Kentucky saw the Chief Justice voicing, in dissent, a concern over the denial to the States of the power to enforce their own standards on obscenity issues, and the reiteration of Mr. Justice Harlan of his long held view that flexibility to the States should be accorded in this field.[86] Walker v. Ohio again saw the Chief Justice dissenting along the same lines as in *Cain,* in that there was no justification for the Court's role of a "supreme and unreviewable board of censorship for the 50 States." [87] Mr. Justice Harlan dissented separately and would have left the state court judgment undisturbed.[88] Hoyt v. Minnesota found Mr. Justice Blackmun, with whom the Chief Justice and Mr. Justice Harlan

---

80. Karalexis v. Byrne, 306 F.Supp. 1363, 1366 (D.Mass.1969).

81. The Court stated:
    It is true that in Roth this Court rejected the necessity of proving that exposure to obscene material would create a clear and present danger of antisocial conduct or would probably induce its recipients to such conduct. * * * But that case dealt with *public distribution* of obscene materials *and such distribution is subject to different objections.* (emphasis supplied).
    394 U.S. at 567, 89 S.Ct. at 1249. The Court then cited as two possible objections the danger that obscene material might be distributed to minors or might transgress one's right to privacy. *Id.*

82. Roth v. United States, 354 U.S. 476, 485, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

83. 394 U.S. at 563–564, 89 S.Ct. at 1247.

84. *Id.* at 566, 89 S.Ct. 1243.

85. Hoyt v. Minnesota, 399 U.S. 524, 90 S.Ct. 2241, 26 L.Ed.2d 782 (1970); Walker v. Ohio, 398 U.S. 434, 90 S.Ct. 1884, 26 L.Ed.2d 385 (1970); Cain v. Kentucky, 397 U.S. 319, 90 S.Ct. 1110, 25 L.Ed.2d 335 (1970).

86. 397 U.S. at 319, 90 S.Ct. 1110.

87. 398 U.S. at 434, 90 S.Ct. 1884. *See* the text for which citation is given at n. 107, infra.

88. 398 U.S. at 434, 90 S.Ct. 1884.

joined in dissent, expressing his views favoring greater state latitude:

> I am not persuaded that the First and Fourteenth Amendments necessarily prescribe a national and uniform measure—rather than one capable of some flexibility and resting on concepts of reasonableness—of what each of our several States constitutionally may do to regulate obscene products within its borders.

> \*   \*   \*   \*   \*   \*

> At this still, for me, unsettled stage in the development of state law of obscenity in the federal constitutional context I find myself generally in accord with the views expressed by Mr. Justice Harlan in Roth v. United States, 354 U.S. 476, 496, 500–503, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); Jacobellis v. Ohio, 378 U.S. 184, 203–204, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964); and A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts, 383 U.S. 413, 455, 458–460, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), and with those enunciated by The Chief Justice in Cain v. Kentucky, 397 U.S. 319, 90 S.Ct. 1110, 25 L.Ed.2d 335 (1970), and in Walker v. Ohio, *supra*.[89]

The most recent memorandum opinion of the Court is Grove Press, Inc. v. Maryland State Board of Censors, 401 U.S. 480, 91 S.Ct. 966, 28 L.Ed.2d 205 (March 8, 1971), in which the Maryland Court of Appeals ruling in Wagonheim v. Maryland State Board of Censors, 255 Md. 297, 258 A.2d 240 (Md.Ct.App.1969) that the movie "I am Curious (Yellow)" was obscene, was affirmed per curiam by an equally divided Court (4) (4) with Mr. Justice Douglas not participating. No clarifying language was contained in the opinion as to the basis for the division or the identity of those voting for or against affirmance.

Other Supreme Court opinions since *Hoyt* are not necessarily helpful in clarifying the confused state of this body of law. As has already been pointed out, Byrne v. Karalexis was considered recently by the Supreme Court on appeal from the three-judge court ruling in Massachusetts in which First Amendment protection was extended to a stage production. The lower court was reversed on other grounds.[90] Stein v. Batchelor, another three-judge court decision, this one from the Northern District of Texas, holding unconstitutional Sections 1 and 2 of Article 527 of the Texas Penal Code, was primarily reviewed by the Supreme Court to determine whether the statute was constitutionally defective on its face. The Court also reversed this case on other grounds.[91] Only in the lengthy dissent of Mr. Justice Douglas in *Stein* is the scope of First Amendment protection even touched upon. Apart from firmly adhering to his long held position that the language of the First Amendment must be strictly construed and permits no curtailment of such freedom through any form of censorship, Mr. Justice Douglas saw no help to be gained by the employment of the three-pronged test pronounced previously by certain members of the Court in *Jacobellis*. All three prongs are subjective in nature, and, as he saw it, uncertainty, rather than certainty, is the resulting standard when such a test or tests are applied.[92]

## I.

## SELECTED STATE COURT DECISIONS ON OBSCENITY

It is not surprising that well meaning judges in the state courts have also been confounded in their efforts to follow the law of the land in the obscenity field. A few examples of this critical situation

---

89. 399 U.S. 524–525, 90 S.Ct. 2241.

90. 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971).

91. 300 F.Supp. 602 (N.D.Tex.1969), vacated and remanded, sub nom., Dyson v. Stein, 401 U.S. 200, 91 S.Ct. 769, 27 L. Ed.2d 781 (1971).

92. 401 U.S. at 213, 91 S.Ct. at 776.

will suffice. Certain of the courts have readily recognized the vulnerability of the three-pronged test of obscenity pronounced by only a plurality instead of a majority of the Supreme Court in *Jabobellis* and *Memoirs,* and have specifically concluded that the *Roth* test is the law and that the "utterly without redeeming social value" test does not constitute binding legal precedent. Cain v. Commonwealth, 437 S.W.2d 769 (Ky.Ct.App. 1969) rev'd per curiam, 397 U.S. 319, 90 S.Ct. 1110, 25 L.Ed.2d 335 (1970); State v. Reese, 222 So.2d 732 (Fla.1969); State v. Hartstein, 469 S.W.2d 329 (Mo. 1971).

Despite the belief that the *Roth* test alone was proper, the three-pronged test has been applied out of an abundance of caution in view of the unsettled state of the decisions in the obscenity field. Wagonheim v. Maryland State Board of Censors, 255 Md. 297, 258 A.2d 240 (Md. Ct.App.1969), aff'd, sub nom., Grove Press, Inc. v. Maryland State Board of Censors, 401 U.S. 480, 91 S.Ct. 966, 28 L.Ed.2d 205 (March 8, 1971).

The state courts have also been confronted with cases involving nude dancing in which the contention of First Amendment protection has been made. In *In re* Giannini, 69 Cal.2d 563, 72 Cal. Rptr. 655, 446 P.2d 535 (1968), a "topless" dancer convicted under a state obscenity statute urged in a habeas corpus proceeding that her dance before an audience was a form of communication which was constitutionally protected. The writ was granted when the prosecution failed to prove that the dance in the context of contemporary community standards appealed to the prurient interest of the audience. The court concluded that for the purposes of determining obscenity the relevant "community standard" was not a national standard, but that to be found in the State of California. The social value test was not reached or considered. In City of Portland v. Derrington, 253 Or. 289, 451 P. 2d 111 (1969), a topless dancer defended on the same constitutional grounds when she was charged with exposing her

breasts while "performing her duties as a dancer." The Oregon Supreme Court reversed and remanded on the grounds that the ordinance in question properly regulated conduct as opposed to speech in bars and taverns and that nudity of employees as sales promotion was as fit a subject for regulation as the licensing of liquor dispensaries. The ordinance was to be upheld unless its provisions unreasonably impinged upon those elements of communication and expression so as to raise a First Amendment question.

In Hudson v. United States, 234 A.2d 903 (D.C.App.1967), a conviction for staging obscene shows was reversed on the theory that such shows were forms of speech and prima facie expressions protected by the First Amendment. Furthermore, it was held that proof of obscenity required among other things evidence of a national community standard. In Morris v. United States, 259 A.2d 337 (D.C.App.1969) the national community standard test in *Hudson* was held to be unnecessary, inasmuch as the performance in question, a female dancer's act which included intentional exposure of the vaginal area, constituted obscenity per se, a separate and distinct category of obscenity, akin in meaning to hard core pornography. The Court held that obscenity per se situations did not require proof of a community standard as a part of the prosecutor's case. *Accord:* Youngstown v. DeLoreto, 19 Ohio App.2d 267, 251 N.E.2d 491 (1969); *cf.* Ginzburg v. United States, 383 U.S. 463, 497, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966), (Justice Stewart dissenting).

This brief reference to state litigation in the obscenity field cannot ignore the endless flow of new cases which, following adjudication by the highest court of a State, now seek review by the Supreme Court. In Barnard v. California, 401 U.S. 901, 91 S.Ct. 881, 27 L.Ed.2d 800, the Court dismissed an appeal from a ruling by the California Supreme Court affirming convictions of nude dancers and the owner of a bar in which they danced for violation of a state statute making it

a crime to publicly expose one's private parts or to assist anyone in so exposing himself or herself. On the other hand, the Court granted certiorari in United States v. Unicorn Enterprises, Inc., 401 U.S. 907, 91 S.Ct. 881, 27 L.Ed.2d 804, in which the Court of Appeals for the Second Circuit had held that a court order authorizing the seizure under the Tariff Act of 1930, 19 U.S.C. § 1305, of "sex education" films showing explicit sex activity was improper and that the films would be released to the importers, since they were not obscene within the meaning of *Memoirs*.

Recognition of the present dissatisfaction in reviewing obscenity decisions rendered by state courts has been noted in Supreme Court decisions. Mr. Justice Harlan observed in a separate opinion in *Interstate Circuit, Inc. v. Dallas*, 390 U. S. 676, 707, 88 S.Ct. 1298, 1313, 1315, 20 L.Ed.2d 225 (1968):

> From the standpoint of the Court itself the current approach has required us to spend an inordinate amount of time in the absurd business of perusing and viewing the miserable stuff that pours into the Court, mostly in state cases, all to no better end than second-guessing state judges. In all except rare instances, I venture to say, no substantial free-speech interest is at stake, given the right of the States to control obscenity.

Similarly, the state courts have evidenced their frustrations. In Cain v. Commonwealth, 437 S.W.2d 769, 775 (Ky. Ct.App.1969) it was stated:

> The court has occupied itself * * * in a somewhat futile attempt to determine what is obscene and what is not obscene. This problem has given the judiciary of this country the greatest challenge of its history and as of the date of this opinion the judicial record reflects nothing more than indecision and failure.

## IV.

### THE FACTORS TO BE USED IN TESTING OBSCENITY AS EXTRACTED FROM PRECEDENTIAL SUPREME COURT OPINIONS

In this remarkable setting courts are faced with the difficult task of gleaning a working definition of what constitutes obscene, lewd or vulgar expressions, bearing prominently in mind at all times the sensitivity of this constitutional area which has so fragmented the considered views of the members of the Supreme Court over the last fourteen years. Until a majority of the Court joins to speak with unequivocal clarity, we move in a climate of uncertainty and can only exercise our best judgment in the light of the reported cases as to what the law is within our concept of ordered liberty.

The place of beginning is the *Roth* standard, that is, whether to the average person under contemporary community standards, the dominant theme of the material taken as a whole appeals to the prurient interest, since it constitutes precedent—a pronouncement of a majority of the Supreme Court. Prurient interest has already been defined, *supra,* and the *Roth* opinion amply demonstrates the latitude of appropriate inquiry. This includes the average person's application of contemporary community standards to the allegedly obscene material; consideration of the dominant theme of the material, not in isolated segments but as a whole; evaluation of its alleged predominant appeal to prurience, as defined in terms of customary candor and as reflected by the common conscience of the community; and, most importantly, the judging of the material in its proper and entire context. The jury charge in *Roth* was upheld as using the proper definition of obscenity under the circumstances of that case.[93]

In view of the fragmented opinions in certain of the subsequent Supreme Court cases, I readily confess to a strong ret-

93. 354 U.S. at 489, 77 S.Ct. 1304.

icence to recognize as a separate and distinct legal standard either the "patently offensive" test in *Manual Enterprises* or the "social importance or value" test emanating from *Jacobellis* and *Memoirs*. Rather, both clearly seem to constitute supplemental evidentiary factors to be considered in the context of a particular case when applying the *Roth* test.[94]

As to patent offensiveness, it would appear to be only in a relatively rare fact situation such as existed in *Manual Enterprises* that this characteristic of a material will exist for resolution separate and apart from the test of prurient interest. Yet, this opinion is not a Court holding, and patent offensiveness should not be accorded the dignity of an independent test existing outside the ambit of *Roth*. A much more serious matter is the social importance or value test which similarly is not a Supreme Court pronouncement. Nor is it by any means a practical test as phrased, unless the law of the land is to be that it is virtually impossible for material to be declared to be obscene. That has been the practical consequence of the philosophical log jam as evidenced by *Redrup*. Furthermore, this "utterly without redeeming social value" test, in addition to constituting a non-sequitur to the *Roth* language from which it presumably emerged, is absolutely in contradiction to the rationale of *Roth,* which clearly recited that certain utterances may actually have some slight social value as a step to truth and yet be obscene.[95] Social importance or value is certainly evidentiary as are the specific prohibitions, where applicable, pertaining to juveniles, invasion of individual privacy and pandering which were enumerated in *Redrup.*

The entire process of determining obscenity can only reduce itself in the last analysis to one of weighing the various factors in supplementation of the *Roth* test in the specific factual context involved. The prevailing opinion in *Memoirs,* however, rejected any weighing process, stating that "[e]ach of the three federal constitutional criteria is to be applied independently; the social value of the book can neither be weighed against nor canceled by its prurient appeal or patent offensiveness."[96] Were *Memoirs* a majority court opinion, I would feel compelled to follow it as the existing law. Since it is not, for the reasons heretofore stated, I do not feel so bound.

A highly practical approach in testing obscenity in our present case in view of the state of the law might be to follow the practice so well articulated by the majority and concurring opinions in Wagonheim v. Maryland State Board of Censors, 255 Md. 297, 258 A.2d 240 (Md. Ct.App.1969), aff'd sub nom., Grove Press, Inc. v. Maryland State Board of Censors, 401 U.S. 480, 91 S.Ct. 966, 28 L.Ed.2d 205 (March 8, 1971). Despite the Maryland Court's strong reservations concerning the legal validity as Supreme Court precedent of the *Memoirs* test, all three prongs were applied out of an abundance of caution. Because of the nature of the contents of the film, "I am Curious (Yellow)", it still failed to pass muster in that case and was declared to be obscene and without First Amendment protection. In the present case, even more so than in *Wagonheim,* the application of the three-pronged test to the present facts does not alter the result. The dancing and related activities at the Martinique and My-O-My Lounges are obscene under the *Roth* test alone, under the three-pronged test, even with its "utterly without redeeming social value" standard, and under any combination of relevant evidentiary factors to be considered with *Roth* as suggested above. Furthermore, the dancing clearly constitutes the hard core variety of pornographic activity and consequently is

94. A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts, 383 U.S. 413, 462, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966) (dissent by Justice White).

95. 354 U.S. at 485, 77 S.Ct. 1304.

96. 383 U.S. at 419–420, 86 S.Ct. at 978.

properly characterized, as some courts have done, as obscenity per se.[97]

If any expression, any activity, any pictorial display or any printed word can be legally determined to be obscene, then certainly the performances at the two Houston lounges under consideration by this Court today constitute obscenity. I share the view expressed by Mr. Justice Clark in *Memoirs* that while "I am not known to be a purist—or a shrinking violet—this * * * is too much even for me."[98] It would be difficult to find a more base and demeaning attitude towards sex and the human body. Here, the commercial exploitation of man's prurient interest is not obscured under even the slightest hint of social worth, artistic endeavor or communication of noteworthy ideas. The initial tone of the presentation is set by the newspaper advertisements, *supra*, and nothing transpiring thereafter has upgraded the nature of its appeal. It is not difficult to decide, even in an area where legal confusion is commonplace, that the performances before this Court for assessment constitute raw obscenity and nothing more. Whatever legally gray conjoint factual areas may exist in other cases in which a weighing process would seem to be appropriate to determine which predominates—expression of worthy ideas to which constitutional protection attaches, or unadulterated misconduct with or without something more —this case presents no such problem. I can only conclude that the activities at both lounges in the context presented in this case are unqualifiedly obscene.

## V.

### THE CONSTITUTIONALITY OF THE STATUTES

The statutes questioned here are Tex. Penal Code Ann., art. 667–19B §§ (b) and (g), and art. 607 § 18 (1952). Article II § 36–43 of the Municipal Code of the City of Houston is also brought before this court for a finding as to its constitutionality, but the court is precluded from consideration of that provision, as a three-judge court is not authorized to determine the constitutionality or enjoin the enforcement of a local ordinance or state statute of local application. Perez v. Ledesma, 401 U.S. 82, 89, 91 S.Ct. 674, 677, 27 L.Ed.2d 701 (1971); Moody v. Flowers, 387 U.S. 97, 101, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967) and cases cited therein.

Article 667–19B makes criminal lewd or obscene conduct at places licensed to serve liquor:

> Art. 667–19B. Lewd or immoral conduct; conduct offensive to public decency.
>
> For the purposes contemplated by this Act, conduct by any person at a place of business where the sale of beer at retail is authorized that is lewd, immoral, or offensive to public decency is hereby declared to include but not be limited to the following prohibited acts; and it shall be unlawful for any person engaged in the sale of beer at retail, or any agent, servant or employee of said person, to engage in or to permit such conduct on the premises of the Retailer:
>
> \* \* \* \* \* \*
>
> (b) The exposure of person or permitting any person to expose his person.
>
> (g) Permitting entertainment, performances, shows or acts that are lewd or vulgar.

Article 607 § 18 prohibits and penalizes vagrancy and prostitution:

> All persons who reside in, enter or remain in any house, place, building or other structure, or who enter or remain in any vehicle, trailer or other conveyance for the purpose of prostitution, lewdness, or assignation.

It is urged that the Texas statutes are unconstitutional because they lack any provision for a judicial adversary hearing to determine obscenity prior to arrest

---

97. *See e. g.*, Morris v. United States, 259 A.2d 337 (D.C.App.1969).

98. 383 U.S. 441, 86 S.Ct. 989.

for lewd, vulgar, and obscene conduct. For that principle, Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed. 2d 649 (1965) is cited. *See also* Marcus v. Search Warrants, etc., 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961); A Quantity of Copies of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964). The court in *Freedman* found that any system of prior restraint of expression bears a heavy presumption against its constitutional validity. *See* Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). State procedures for dealing with obscenity must be formulated with regard to the possible consequences of constitutionally protected speech, Marcus v. Search Warrants, etc., 368 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961).

However, the *Freedman* doctrine is not directly applicable to the procedures here in issue. *Freedman* specifically held that "a *noncriminal* process which requires the prior submission of a film to a censor avoids constitutional infirmities only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." [99] The Court listed the procedural criteria: (1) the burden of proving that the film is unprotected expression must rest on the censor; (2) although the State may require advanced submission of all films, only a procedure requiring a judicial determination suffices to impose a valid final restraint. A Quantity of Copies of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809. The Court went on to say that the censor must, within a specified brief period, either issue a license or go to court to restrain the showing of the film, and that any advanced determination must be limited to preserving the status quo. *In accord* with *Freedman* is United States v. Thirty-Seven Photographs, 309 F.Supp. 36 (C.D.Cal.1970). *Contra,* United States v. One Carton Positive Motion Picture Film Entitled "491", 367 F.2d 889 (2d Cir. 1966).

Thus, *Freedman* must be distinguished in that there a civil statute was questioned and the procedures therein found lacking. The Court of Appeals for the Fifth Circuit, in United States v. Fragus, 428 F.2d 1211 (5th Cir. 1970), upheld the arrest of a transporter of obscene materials made under ordinary criminal processes without a prior judicial determination of obscenity of the materials carried. *Fragus* looked with approval upon the Supreme Court's affirmance of Milky Way Productions, Inc. v. Leary, 305 F.Supp. 288 (S.D.N.Y. 1969), aff'd 397 U.S. 98, 90 S.Ct. 817, 25 L.Ed.2d 78 (1970), and its distinguishing of massive seizures of material for purposes of trial and ultimate destruction from incidental seizures, or seizure of "instrumentalities and evidence of the crime."

*Fragus* amply demonstrates the important distinction between the requirements for a valid civil censorship statute, as in *Freedman,* and the requirements for a workable criminal statute, such as the ones now in question. In Stein v. Batchelor, 300 F.Supp. 602, 608 (N.D.Tex.1969), the Court stated:

We conclude, however, that the absence of such a provision does not invalidate the statute. None of the cases cited support this proposition. In most of the cases cited the Supreme Court reversed a conviction because the *procedures* involved were inadequate. (emphasis supplied)

I find nothing lacking in the procedures utilized during the "raids", arrests, and subsequent handling of the Martinique and the My-O-My. Upon motion, a temporary restraining order was immediately issued for the purpose of preventing any disturbance of either Club's entertainment routine. Following the request and appointment of the three-judge court, an evidentiary hearing was granted and held with due speed. At all times pending this Court's ruling, the protection of the activities of plaintiff and in-

99. 380 U.S. at 58, 85 S.Ct. at 738–739 (emphasis supplied).

tervenor has been preserved through extensions of the initial restraining order. No material has been "seized", no activity proscribed. Here, then, procedures need not be subjected to any further inquiry.

Plaintiff and intervenor challenge the constitutionality of the Texas statutes in question, in that all are so vague, imprecise and indefinite that prosecution under them amounts to "raw censorship", effectively chilling freedom of speech protected by the First Amendment.[100] This has become an increasingly popular procedure for litigants, since an academic, ivory tower view in vacuo permits almost any statute to be conceivably subject to some criticism of its wording. Yet men of ordinary intelligence, applying the words of the statute fairly and *in context* and giving them their *common meaning*,[101] Miller v. State, 156 Tex.Cr. R. 389, 243 S.W.2d 175 (1951), can scarcely fail to realize that the conduct in question today is proscribed by those statutes. The United States Supreme Court, in *Roth*, laid down some sound guidelines:

> This Court, however, has consistently held that lack of precision is not itself offensive to the requirements of due process. " * * * The Constitution does not require impossible standards"; all that is required is that the language "conveys sufficiently definite warnings as to the proscribed conduct when measured by common understanding and practices * * *." United States v. Petrillo, 332 U.S. 1, 7, 8, 67 S.Ct. 1538, 91 L.Ed. 1877, 1883.[102]

Furthermore, legislative provision for the reading in of a common law meaning or a general understanding of statutory language is provided. Tex.Penal Code Ann., art. 8.10 (1952) provides:

> Words which have their meaning specially defined shall be understood in that sense, though it be contrary to their usual meaning; and all words used in this Code, except where a word, term or phrase is specially defined, are to be taken and construed in the sense in which they are understood in common language, taking into consideration the context and subject matter relative to which they are employed.

In *Roth*, the United States Supreme Court upheld a federal obscenity statute which proscribed the mailing of "obscene, lewd, lascivious, or filthy" material "or other publication of an indecent character." Also held to be constitutional was the California statute in the companion case, Alberts v. California, which made punishable the sale or advertisement of "obscene or indecent" material. 354 U.S. at 491, 77 S.Ct. 1304, 1312. The import of this decision is that, simply because these words do not mean the same to everyone, or simply because different juries might reach different results under the same statute, the words do not fail for unconstitutional vagueness. There will always be difficult marginal cases. The test which these statutes must meet or else fail for vagueness need not be designed to make all gray areas either black or white. Words measured by their common meaning and applied under the proper legal standards which give adequate warning of the con-

100.  Plaintiffs also allege that the statutes are being applied in an arbitrary manner, by agents who cannot even articulate the standards or criteria of "obscenity" upon which they regulate, so as to constitute censorship of the type condemned by the Supreme Court. Shuttlesworth v. City of Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). Such is not the case. Law enforcement officers testified, and showed to the satisfaction of this Court that they acted conscientiously and even-handedly, upon advice of the District Attorney, limiting

their attacks to the regulation of behavior which counsel interpreted (as best they could in this confusion) as unprotected in the wake of recent Supreme Court decisions. Their actions are systematic and consistent, although plaintiffs would attempt to convince us otherwise.

101.  Roth v. United States, 354 U.S. 476, 491, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); United States v. Petrillo, 332 U.S. 1, 7, 8, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947).

102.  354 U.S. at 491, 77 S.Ct. at 1312.

duct proscribed when taken in context are constitutionally sound.

The words with which we concern ourselves in this case are certainly no more vague when the relevant sections of the statute are read in their entirety, than the words held constitutional in *Roth*.

Plaintiff and intervenor further urge that these words, absent a provision incorporating the definitions of *Roth* and *Memoirs,* may not be saved, and that the Court may not breathe life into the statutes by incorporating *Roth* and *Memoirs* by reference. To this effect they cite Stein v. Batchelor, 300 F.Supp. 602, 608 (N.D.Tex.1969), vacated and remanded sub nom., Dyson v. Stein, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971), in which the Court struck down the Texas obscenity statute because it lacked the provision that to be obscene, material must be "utterly without redeeming social value." The district court stated that, since the *Memoirs* criteria had been added to the *Roth* definition of obscenity by the Supreme Court, and, since that definition had not been included in the Texas statute, the statute was unconstitutional. The *Stein* decision seems to be weighted heavily in favor of similar dictum emanating from the Court of Appeals for the Fifth Circuit in Phelper v. Decker, 401 F.2d 232, 240 (5th Cir. 1968).

There are two points upon which I must respectfully differ from the Court deciding *Stein.* First, the prevailing opinion in *Memoirs* lacks precedential value, due to the inability of the Court to agree upon and render a majority opinion. Second, I cannot accede to the view that the Constitution requires every legislature to rewrite every statute in this First Amendment area subsequent to every case decided by the United States Supreme Court, so as to incorporate the nuances of that latest decision into the statutory provisions. A judicial technique that constantly requires the amendment or repeal of a statute and the substitution of another, incorporating the current magic words, is patently erroneous. The Supreme Court stated in *Roth* that we must interpret statutory wording under the common or generally accepted meaning given that wording. Is there any reason then why we may not interpret the same statute under the correct legal standards which have viability separate and apart from any particular statute? [103] For example, the words "due process of law" become viable only when we incorporate by reference and by general knowledge the many specific requirements of due process in any given situation as established and modified by *stare decisis.*

I am persuaded that the laws questioned here are not voidably vague and that they do give sufficient notice and guidance in all but those grey, penumbral areas excepted in *Roth* to be constitutionally sound.[104] The statutes before us speak of lewd, immoral, vulgar or immodest conduct, and of conduct offensive to public decency. It would be absurd to find semantical difficulties in equating these words with obscene conduct.[105]

103. Slusser v. State, 155 Tex.Cr. 160, 232 S.W.2d 727, 730 (1950):
   The words "lewd" and "lascivious" are not defined in the statutes and must therefore be given their ordinary meaning to be arrived at in part by a determination of the legislative intent in the use of the words in the particular statute.

104. 354 U.S. at 491–492, 77 S.Ct. 1304; United States v. Wurzbach, 280 U.S. 396, 399, 50 S.Ct. 167, 169, 74 L.Ed. 508 (1930):
   Wherever the law draws a line there will be cases very near each other on opposite sides. The precise course of

the line may be uncertain, but no one can come near it without knowing that he does so, if he thinks, and if he does so, it is familiar to the criminal law to make him take the risk.

105. Roth v. United States, 354 U.S. 474, 491–492, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); United States v. One Carton Positive Motion Picture Film Entitled "491", 248 F.Supp. 373, 376 (S.D.N.Y. 1965); *cf.* Cleveland v. United States, 329 U.S. 14, 67 S.Ct. 13, 91 L.Ed. 12 (1946); Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1916).

Thus, in this analysis of the proscriptions of the statutes, and of the alleged constitutional infirmities of the same, no difficulty should be encountered in concluding that these words are synonymous with the word obscene, as defined by the United States Supreme Court.

## VI.

### THE NATURE OF THE COMMUNITY STANDARD—WHO DECIDES WHAT IS OBSCENE?

I encounter greater legal complexities in deciding the *nature* of the community which must measure the quality of the questioned conduct, but practical considerations do much to supply sound guidelines. Although a majority of Justices of the Supreme Court have never agreed upon this issue, the *Jacobellis* case has been interpreted by some as requiring a national community standard in a determination of obscenity cases. There are numerous dissents from that position, since it was only advanced by two Justices, Brennan and Goldberg. Justices Warren and Clark in *Jacobellis* and Mr. Justice Harlan in *Roth* and in *Memoirs* dissented, being cognizant of the advantage of adopting a statewide or even more local community standard as opposed to a national standard in applying an obscenity test. This dissatisfaction with the national standard is reiterated only recently by Chief Justice Burger, dissenting in Hoyt v. Minnesota, 399 U.S. 524, 90 S.Ct. 2241, 26 L.Ed.2d 782 (1970); Walker v. Ohio, 398 U.S. 434, 90 S.Ct. 1884, 26 L.Ed.2d 385 (1970); and Cain v. Kentucky, 397 U.S. 319, 90 S.Ct. 1110, 25 L.Ed.2d 335 (1970). To the same effect, see the dissents by Justices Blackmun and Harlan in *Hoyt*, and the dissent by Justice Harlan in *Cain* and *Walker*. Certain excerpts of these dissents warrant reiteration in connection with the possible trend of judicial thinking on the issue of community standard.

Mr. Justice Blackmun, in *Hoyt*, stated that the Constitutional guarantee of free speech embodied a standard capable of flexibility and adaptable to the needs of the several States in controlling obscenity.[106] And in *Walker*, Mr. Chief Justice Burger added a second reason for dissatisfaction with the national standard:

I find no justification, constitutional or otherwise, for this Court assuming the role of a supreme and unreviewable board of censorship for the 50 States, subjectively judging each piece of material brought before it without regard to the findings or conclusions of other courts, state or federal. That is not one of the purposes for which this Court was established.[107]

California Supreme Court Justice Tobriner, deciding In re Giannini, 69 Cal.2d 563, 72 Cal.Rptr. 655, 446 P.2d 535 (1968) upheld the trial judge's ruling that the relevant community in that case was the State of California. He noted support in the cases for at least three standards. State v. Hudson County News Company, 41 N.J. 247, 265, 196 A.2d 225 (1963) (national standard); Excellent Publications, Inc. v. United States, 309 F.2d 362, 365 (1st Cir. 1962) (dictum supporting national standard); McCauley v. Tropic of Cancer, 20 Wis.2d 134, 149, 121 N.W.2d 545 (1963) (state standard); Gent v. State, 239 Ark. 474, 393 S.W.2d 219, rev'd on other grounds sub nom., Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967) (local or city standard). Justice Tobriner noted that a third deficiency existed in applying a national standard: there exists no nationwide uniformity of attitudes or standards of what constitutes obscenity,[108] 72 Cal.Rptr. at 666, 446 P.

---

106. 399 U.S. at 524, 90 S.Ct. 2241.

107. 398 U.S. at 434, 90 S.Ct. 1884.

108. Justice Tobriner in *Giannini*, calls attention to the importance of the question of geography in obscenity as opposed to other constitutional areas:

Constitutional standards of criminal procedures, however, do not, at least explicitly, take into account 'community' standards. The law of obscenity, on the other hand, by definition reflects a balancing of candor and shame in the community, and it is thus quite perti-

2d at 546. Such an approach squares precisely with that of Mr. Justice Harlan in his opinion in *Roth*, 354 U.S. at 505, 77 S.Ct. 1304.

The shaping of an enlightened decision as to the proper frame of reference for measurement of conduct must necessarily include consideration of the applier of a standard. That is, who is to read the *Roth* definition, apply the community standard and render the decision as to obscenity?

Preliminarily, it should be noted that there are numerous instances in which the Justices themselves point up the inadvisability of retaining the Supreme Court as a Board of Super Censors. Mr. Justice Harlan, dissenting in *Roth*, observed that, not only is the State's interest in regulating pornography greater and more relevant to the community affected than that of the federal government, but the dangers of federal censorship should be avoided. More importantly, the states provide an excellent testing ground for innovative social control:

It has often been said that one of the great strengths of our federal system is that we have, in the forty-eight states forty-eight experimental social laboratories. "State statutory law reflects predominantly this capacity of a legislature to introduce novel techniques of social control. The federal system has the immense advantage of providing forty-eight separate centers for such experimentation." [Hart, the Relations Between State and Federal Law, 54 Col.L.Rev. 489, 493] * * * [I]t seems to me that no overwhelming danger to our freedom to experiment and to gratify our taste in literature is likely to result from the suppression of a borderline book in one of the states, so long as there is no uniform nation-wide suppression of the book, and so long as other states are free to experiment with the same or bolder books.

354 U.S. at 505–506, 77 S.Ct. at 1320. *See also* the dissent of Mr. Justice Harlan in *Memoirs*, 383 U.S. at 458, 86 S.Ct. 975; Walker v. Ohio, 398 U.S. 434, 90 S.Ct. 1884, 26 L.Ed.2d 385 (1970) (dissents of Justices Burger and Harlan); Cain v. Kentucky, 397 U.S. 319, 90 S.Ct. 1110, 25 L.Ed.2d 335 (1970) (dissents of Justices Burger and Harlan); Hoyt v. Minnesota, 399 U.S. 524, 90 S.Ct. 2241, 26 L.Ed.2d 782 (1970) (dissent of Justices Blackmun, Burger and Harlan). Perhaps, most succinct in his view of the matter was Mr. Justice Douglas in a concurring opinion in *Memoirs* when he observed:

We are judges, not literary experts or historians or philosophers. We are not competent to render an independent judgment as to the worth of this or any other book, except in our capacity as private citizens.[109]

A contrary view was expressed by Mr. Justice Brennan in *Jacobellis*, 378 U.S. at 190, 84 S.Ct. 1676.

Mr. Justice White urged the Court and the country to remember, in his *Memoirs* dissent, that it was not the Constitution that banned books, movies, or dances. Rather, it is the state legislature, the legal body most representative of the people, that reflects the current social thought by promulgating it into law:

Censure stems from a legislative act, and legislatures are constitutionally free to embrace such books *whenever they wish to do so.*

383 U.S. at 462, 86 S.Ct. at 1000. Thus, a state standard for regulation of obscene materials—a standard "capable of

---

nent to inquire which community's attitudes should be the touchstone of decision.
72 Cal.Rptr. at 666, 446 P.2d at 546 n. 12.

109. 383 U.S. at 426, 86 S.Ct. at 981–982. Mr. Justice Black also observed in *Jacobellis* that:

If, despite the Constitution * * * this Nation is to embark on the dangerous road of censorship, * * * this Court is about the most inappropriate Supreme Board of Censors that could be found.
378 U.S. at 196, 84 S.Ct. at 1682.

some flexibility and resting on concepts of reasonableness", Hoyt v. Minnesota, 399 U.S. at 524, 90 S.Ct. 2241—which is passed into law by the state legislative branch to insure the protection of the moral and social patterns of that segment of the populace as they see fit, should be honored. This is an important point, since through the elective process the changes in the sensitivities and mores of the populace can be most accurately reflected by the passage, abolition or modification of obscenity statutes. No state is subjected to the Constitutional requirement that it enact such a statute.

Who, then, is to determine what is obscene, once an obscenity statute is passed? The most effective method is the proper utilization of a jury. A locally selected jury applying a local community standard under an appropriate court charge could ably decide whether the questioned expression or activity appeals to the prurient interest of the average person within that community and whether the standards of decency accepted in the community were affronted by such conduct.[110]

The Court in In re Giannini discussed, with some dissatisfaction, the use of a jury as the trier of fact. However, that dissatisfaction was based primarily upon the practice of determining obscenity, either by judge or jury, without the introduction of expert testimony and other evidence relevant to contemporary community standards. Whoever might be the trier of fact, the Court stated, the ascertainment of obscenity must be more than "a merely subjective reflection of the taste or moral outlook of individual jurors or individual judges." 72 Cal. Rptr. at 664, 446 P.2d at 544.

Contrary to the *Giannini* opinion, however, it must be recognized that the introduction of expert testimony is not the only alternative to deeming a jury to be "a metaphysical embodiment of the 'community,' and therefore intrinsically cognizant of community standards." There are obscenity cases, just as there are tort cases, which might necessitate the introduction of expert testimony. The testimony of a literary scholar could be critical in deciding whether a certain work contained genuine literary or social significance. Likewise, a psychologist or psychiatrist could conceivably be instrumental in understanding the prurient interest of deviant groups. *See Kahm v. United States*, 300 F.2d 78 (5th Cir. 1962).[111] But in cases of the type now before this court in which the conduct in its entirety may not be said to possess any redeeming quality, and indeed, none are alleged, a jury need be furnished nothing more than a complete factual account of the questioned activity and the proper legal standard upon which to judge the status of that conduct. Judge Pope, writing for the Court in

---

110. *Id.* 72 Cal.Rptr. at 667–669, 446 P.2d at 547–549 (dissent by Justice Burke).

111. *See also* the commentary of Judge Learned Hand on the value of a jury in obscenity cases, United States v. Levine, 83 F.2d 156, 157 (2d Cir. 1936) ; United States v. Kennerley, 209 F. 119, 121 (S.D. N.Y.1913). In *Levine*, he said :

[T]he problem is to find a passable compromise between opposing interests, whose relative importance, like that of all social or personal values, is incommensurable. We impose such a duty upon a jury * * * because the standard they fix is likely to be an acceptable mesne, and because in such matters a mesne most nearly satisfies the moral demands of the community. There can never be constitutive principles for such judgments, or indeed more than cautions to avoid the personal aberrations of the jurors. * * * [T]he work must be taken as a whole, its merits weighed against its defects * * *; if it is old, its accepted place in the arts must be regarded; if new, the opinions of competent critics in published reviews or the like may be considered; what counts is its effect, not upon any particular class, but upon all those whom it is likely to reach. Thus, 'obscenity' is a function of many variables, and the verdict of the jury is not the conclusion of a syllogism of which they are to find only the minor premise, but really a small bit of legislation ad hoc, like the standard of care. 83 F.2d at 157.

*Kahm* correctly evaluated the evidentiary requirements in an analogous situation:

> It is plain to us that when the jury was instructed by the trial court in language such as that approved by the Supreme Court in the *Roth* case, it was fully capable of applying those standards and that charge to the material shown to have been mailed here. Nothing is more common than for a jury in a case involving charges of negligence, as for example negligent homicide, to determine whether the proven conduct measures up to the standards of a reasonably prudent man. We think it may fairly be said that no amount of testimony by anthropologists, sociologists, psychologists or psychiatrists could add much to the ability of the jury to apply those tests of obscenity to the materials here present.

*Id.* at 84. *Contra,* In re Giannini, 69 Cal.2d 563, 72 Cal.Rptr. at 664, 446 P.2d at 544. The analogy to tort law has been explored and criticized. The argument is advanced that a jury can better understand and evaluate the actions of a reasonable man under given circumstances in the negligence field than it can the "complex compendium of attitudes and practices" which form the relevant community standard. 72 Cal. Rptr. at 665, 446 P.2d at 545. However, there is no reason why this should be so in a properly tried case in which a jury is adequately charged following a full presentation of the relevant proof. Once the community of reference has been set, the correct standard of law enunciated, and a jury fairly chosen from within that community, it should be no more difficult to determine whether certain material appeals to the prurient interest of the average person than it is to determine whether certain actions are indicative of the behavior of a reasonable man in given circumstances. After all, we call upon juries to pass upon such concepts as "seaworthiness", "breach of implied warranty of workmanlike service," "conduct which precludes indemnity," "proximate cause", "res ipsa loqui-

tur" and many more. A jury can be equally as capable of finding that the material or activity in question conforms to contemporary community standards as it is in finding that conduct conforms to historical common law or other legal standards. Moreover, as the conscience of the community, it constitutes the most responsive body in our society to change in social values including attitudes towards sex. We simply have no more sensitive vehicle for reflecting the mood of our people which, in turn, is the basis on which our laws including our statutes must rest. I share the views of Mr. Justice Brennan when he observed in dissent in Kingsley Books, Inc. v. Brown, 354 U.S. 436, 448, 77 S.Ct. 1325, 1331, 1 L.Ed.2d 1469 (1957):

> The jury represents a cross-section of the community and has a special aptitude for reflecting the view of the average person. Jury trial of obscenity therefore provides a peculiarly competent application of the standard for judging obscenity which, by its definition, calls for an appraisal of material according to the average person's application of contemporary community standards. A statute which does not afford the defendant, of right, a jury determination of obscenity falls short, in my view, of giving proper effect to the standard fashioned as the necessary safeguard demanded by the freedoms of speech and press for material which is not obscene.

## VII.

### STATE AND FEDERAL ACCOMMODATION UNDER OUR CONCEPT OF ORDERED LIBERTY

The question confronting the Court is not to determine what degree of freedom is required by our Federal Constitution in the area of free speech. Rather, the inquiry is this: what are the relative legal requisites of the national Constitution that must be met in order to protect individual speech and expression and at the same time permit the separate state laws to operate effectively in their regulation of activities which are viewed

as harmful and disruptive to the community? The basic constitutional concept of the protected right of free speech is not ignored or diminished in importance by the arguments propounded by Justices Burger, Harlan and Blackmun in *Hoyt, Cain,* and *Walker, supra.* But the power of the State to promulgate laws prohibiting certain activity which might incidentally restrict First Amendment freedoms is likewise a right, *O'Brien supra*—the right of the community as a whole based on the public interest in the order and morality of its society. Thus, the Constitution not only secures basic personal freedoms, but also accords a broad grant of power to the States in areas not particularly enumerated as federal powers or specifically prohibited to the states.[112] This broad grant includes the state power to promulgate regulations aimed at the protection of the health, welfare and morals of its citizens. Where the existence of 50 states is involved, there emerges the possibility, at least, of 50 varied approaches to the prohibition or accommodation of obscenity, none of which need offend national constitutional guidelines when resting on concepts of reasonableness. *See* the dissent in *Hoyt,* 399 U.S. at 524–525, 90 S.Ct. 2241. The uniqueness of each State, operating within and yet tempered by this federal framework of basic governing principles, has resulted in a unique contribution to government—our concept of ordered liberty. Palko v. Connecticut, 302 U.S. 319, 324–325, 58 S.Ct. 149, 82 L.Ed. 288 (1937).

The question arises as to what extent the State may go in promulgating its laws and still remaining within the ambit of constitutionality.

Under *O'Brien*,[113] the state's regulation must be upheld if "(1) it is within the constitutional power of the Government; (2) if it furthers an important or substantial governmental interest; (3) if the governmental interest is unrelated to the suppression of free expression; and (4) if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." 391 U.S. at 377, 88 S.Ct. at 1679. Thus, an ordinance or statute attacked on First Amendment grounds must also be granted a rebuttable presumption of propriety.[114] *See* Parks v. Allen, 426 F.2d 610, 613–614 (5th Cir. 1970). In other words, if the statute is capable of interpretation in the constitutional sense as restricting or curtailing only actions or materials not protected by the Constitution, that interpretation must be adopted.[115] An arguably reasonable statute should be sustained. Parks v. Allen, 426 F.2d at 614; Stein v. Batchelor, 300 F. Supp. 602, 608 (N.D.Tex.1969); S. H. Kress & Co. v. Johnson, 16 F.Supp. 5 (D.Colo.1936), aff'd, 299 U.S. 511, 57

---

112. U.S.Const. Amend. X.

113. *Compare* the views of Mr. Justice Brennan, speaking for the majority in *Roth*:
    [We] reject, in this case, the argument that there is greater latitude for state action under the word 'liberty' under the Fourteenth Amendment than is allowed to Congress by the language of the First Amendment.
    *with* the test used by Mr. Justice Harlan in his opinion (concurring in part, dissenting in part):
    We do not decide whether the policy of the State is wise, or whether it is based on assumptions scientifically substantiated. We can inquire only whether the state action so subverts the fundamental liberties implicit in the Due Process Clause that it cannot be sustained as a rational exercise of power.

354 U.S. at 493, n. 31, 501, 77 S.Ct. at 1313, 1317.

114. Potential or prima facie First Amendment protection of speech has broadened perceptibly, and emphasis now is on the protection of communication.
    The protection of this interest depends upon a balancing process: the weighing of the interest of the state in suppressing or regulating the questioned conduct as against the opposing interest in the interchange of ideas.
    In re Giannini, 69 Cal.2d 563, 72 Cal. Rptr. 655, 659, 446 P.2d 535, 539 n. 2 (1968) and cases cited therein.

115. Bibb v. Navajo Freight Lines, Inc., 359 U.S. 520, 529, 79 S.Ct. 962, 3 L.Ed. 2d 1003 (1959); Anniston Mfg. Co. v. Davis, 301 U.S. 337, 351–352, 57 S.Ct. 816, 81 L.Ed. 1143 (1937).

S.Ct. 49, 81 L.Ed. 378 (1936). *See also* Parisian Club v. O. N. Humphries, et al. (S.D.Tex. unreported, C.A. No. 70–H–64).

Certainly Mr. Justice Blackmun does not denigrate the importance of the National Constitution by granting state laws this presumption of propriety, Hoyt v. Minnesota, 399 U.S. 524, 90 S.Ct. 2241, 26 L.Ed.2d 782 (1970). And Mr. Justice Harlan's concepts, so long ago enunciated in *Roth, Jacobellis,* and *Memoirs,* are now seemingly looked upon with favor by Justices Burger and Blackmun, Hoyt, supra, Walker v. Ohio, 398 U.S. 434, 90 S.Ct. 1884, 26 L.Ed.2d 385 (1970); and Cain v. Kentucky, 397 U.S. 319, 90 S.Ct. 1110, 25 L.Ed.2d 335 (1970). This view holds that flexibility within the concepts of reasonableness is the only proscription of the Constitution, rather than the notion of a Constitution which is characterized by rigidity and lack of accommodation to the unique variables and nuances which identify the fifty component parts of this great Nation. If this concept of ordered liberty does violence to our Constitution including the First Amendment, then a majority of the Supreme Court should forge proper guidelines, and we will adhere to their pronouncements. So far as I can determine, the law of the land does not compel unvarying national uniformity in this legal area. Instead, our approach must be one sensitive "to the legitimate interests of both State and National governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." Younger v. Harris, 401 U.S. at 44, 91 S.Ct. at 750. For the reasons heretofore set forth, I fail to discern any legal obligation to strike down state statutes which in my judgment satisfy the test of constitutional reasonableness, while reflecting the will of the citizenry of a particular state.

With this background of our Federal framework, it is appropriate that some analysis be made of the Texas statutes here questioned, deciding whether the state's right to regulate morality and public behavior collide unconstitutionally with the First Amendment.

When a legislative body concludes that the mores of a community call for an extension of an impermissible limit, an enactment aimed at the evil is plainly within its power, if it does not transgress the boundaries fixed by the Constitution for freedom of expression.

Winters v. New York, 333 U.S. 507, 515, 68 S.Ct. 665, 670, 92 L.Ed. 840 (1948).

The Texas statutes provide for the regulation of obscene conduct in a number of ways under the state's police powers. Two of these regulations are here alleged to be unconstitutional; the regulation of lewdness in the context of vagrancy, Tex.Pen.Code Ann. art. 607 § 18, and obscenity in the context of liquor control, Tex.Pen.Code Ann. art. 667–19B §§ (b) and (g). I find it exceedingly difficult to conclude that the State of Texas cannot regulate and preserve punishment for prostitution, lewdness, or assignation; that is, obscene or immoral conduct, *accord,* Gallant v. Barlow, SA–69–CA–158 (W.D.Tex.1969), or to penalize and prohibit obscene activity in an establishment licensed by the State to sell intoxicants. It would be equally difficult to argue that the regulation of obscene conduct as defined by the Supreme Court and as specified by these state statutes runs afoul of First Amendment guarantees.

It should be remembered that the granting of a right to sell intoxicating liquor has been held to be a privilege and not a right. *See e. g.,* Crowley v. Christensen, 137 U.S. 86, 11 S.Ct. 13, 34 L.Ed. 620 (1890); State v. Bush, 151 Tex. 606, 253 S.W.2d 269 (1952); Jones v. Marsh, 148 Tex. 362, 224 S.W.2d 198 (1949). The Texas Liquor Control Act specifically provides for a liberal con-

struction of its terms,[116] and inclusive within this construction is the power to regulate business establishments which sell or dispense alcoholic beverages.

In addition to the general grant of power to the States under the Constitution, the States were granted an extensive right to regulate the liquor industry and traffic in intoxicating liquor as an exercise of powers under the Twenty-First Amendment.[117] Joseph E. Seagram & Sons, Inc. v. Hostetter, 384 U.S. 35, 41–42, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966); Parks v. Allen, 426 F.2d 610, 613 (5th Cir. 1970); Hornsby v. Allen, 326 F.2d 605 (5th Cir. 1964). The exercise of this power is left to the discretion of the state as long as the minimal demands of the Fourteenth Amendment due process and equal protection requirements have been met, and there is reasonable basis for the regulation.

Furthermore, implicit in the scope of the Twenty-First Amendment and the nature of the state's almost plenary power under that Amendment is the right of the state's legislative body "to decide on the wisdom and utility of legislation."

> The doctrine * * * that due process authorized courts to hold laws unconstitutional when they believe the legislature has acted unwisely * * * has long since been discarded. We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies who are elected to pass laws.

Joseph E. Seagram & Sons, Inc. v. Hostetter, 384 U.S. 35, 47, 86 S.Ct. 1254, 1262, 16 L.Ed.2d 336 (1966). *See also* Mahoney v. Joseph Triner Corp., 304

U.S. 401, 404, 58 S.Ct. 952, 82 L.Ed. 1424 (1938); Krauss v. Sacramento Inn, 314 F.Supp. 171, 177 (E.D.Cal.1970).

## VIII.

### CONCLUSION

These observations have been voiced in an address to the merits, albeit, admittedly, it is a non-dispositive address. It is unlikely after all of these years that there exists any historical or legal source which, by itself, would constitute a clear, unerring signal, heretofore unheard, as to the meaning of the First Amendment freedoms in our federal-state frame of reference. Fortunately, the facts in Martinique and My-O-My are not so difficult of resolution that they conceivably would meet one professed test of obscenity and fail another. Instead, they can be characterized readily as activities which, if countenanced, amount to nothing more than a rank abuse in application of individual First Amendment liberties in an effort to assist and protect the commercial distribution of the salacious and the obscene. Such monetary exploitation of man's prurience has been aptly characterized by Mr. Justice Clark in his dissent in *Memoirs* as giving "the smut artist free reign to carry on his dirty business."[118] I wholeheartedly concur.

What is actually more important than the facts in Martinique and My-O-My is the answering of the query as to what guidelines we are to follow in future cases when relatively few presently exist which can be relied upon as clear-cut legal precedents. This question, if fully answered, calls for precedential resolution of many of the issues treated here—

116. Texas Penal Code Ann. art. 666–2 (1952):

> This entire Act shall be deemed an exercise of the police power of the State for the protection of the welfare, health, peace, temperance, and safety of the people of the State, and all its provisions shall be literally construed for the accomplishment of that purpose.

117. Department of Revenue v. James B. Bean Distilling Co., 377 U.S. 341, 344, 84 S.Ct. 1247, 12 L.Ed.2d 362 (1964);

Hostetter v. Idlewild Bon Voyage Liquor Corp., 377 U.S. 324, 330–331, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964); Carter v. Virginia, 321 U.S. 131, 135, 64 S.Ct. 464, 88 L.Ed. 605 (1944); Ziffrin, Inc. v. Reeves, 308 U.S. 132, 138, 60 S.Ct. 163, 84 L.Ed. 128 (1939); Neel v. Texas Liquor Control Board, 259 S.W.2d 312 (Tex.Civ.App.—Austin 1953, writ ref'd n. r. e.).

118. 383 U.S. at 441, 86 S.Ct. at 989.

that is, clarification of the test of obscenity and what constitutes the community standard, a determination of who is to decide what is obscene as well as what is the yardstick to be applied in measuring state and national governmental accommodation within our federal framework. In large measure, it is perhaps not inappropriate to state that these issues reduce themselves to a determination of what we as a people want our society to be, since laws lose their viability without the affirmative support of the citizenry.

Apart from the multiple problems heretofore discussed, the present course in this case is clear. The recent pronouncements of the Supreme Court can be read in no other light than to require federal abstention, absent a compelling and exceptional circumstance not capable of relief in state court. Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); Dyson v. Stein, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971); Byrne v. Karalexis, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971).

A recent decision out of the Southern District of Texas comports with this approach in the handling of obscenity cases. Montgomery d/b/a Seven Veils v. Short, 327 F.Supp. 726 (S.D.Tex.1971). See also C.A.No.71–H–303, Lester Musterman d/b/a The Outer Limits v. C. V. Kern, Sheriff of Harris County, Texas, et al.

The facts of Martinique and My-O-My fall far short of any demonstration of irreparable damage;[119] neither is there any potential infringement of a constitutional right for which injunctive or declaratory relief need be considered. I therefore adopt without reservation the import of these decisions of the Supreme Court as well as render full support to the principles of comity there restated.

---

119. There is no showing of irreparable harm or bad faith prosecution by either plaintiff or intervenor which meets the test of *Younger* and its companion cases. Moreover, there is pending a criminal proceeding in state court against those employees of the Martinique charged with violations of the statutes questioned here, wherein all constitutional issues may be raised. Thus, plaintiff comes directly within the purview of these recent decisions. Those who were charged pursuant to their activities at the My-O-My entered pleas of guilty without raising any constitutional objections or infirmities in state court, and have made no attempt at appeal. We cannot now entertain their objections to the statutes in a proceeding which would obviously thwart the clear mandate of the Supreme Court that the state forum should not be bypassed by procedural manipulations. *Id.*